UNITED STATES of America,
Appellant,
v.
Frank N. MATTISON and Ida G. Mattison, Appellees.
No. 16257.

United States Court of Appeals
Ninth Circuit.
Oct. 29, 1959.

Charles K. Rice, Asst. Atty. Gen., Melvin L. LeBow, Lee A. Jackson, Melva M. Graney, S. Dee Hanson, Attorneys, Department of Justice, Washington, D. C., Ben Peterson, U. S. Atty., Kenneth G. Bergquist, Asst. U. S. Atty., Boise, Idaho, for appellant.

Langroise & Sullivan, Boise, Idaho; Woolvin Patten, Little, LeSourd, Palmer, Scott & Slemmons, Seattle, Wash., for appellees.

Before CHAMBERS and HAMLEY, Circuit Judges, and KILKENNY, District Judge.

HAMLEY, Circuit Judge.

In this tax refund case the Government appeals from a judgment for the taxpayer in the amount of $53,461.89. The questions presented here have to do with the computation of gain realized when the taxpayer purchased all the stock of a corporation and sold the tangible assets thus acquired.

The facts are set out at length in the district court's opinion which is reported in 163 F.Supp. 754. For the purposes of this opinion, the following résumé is sufficient:

Westcott Oil Company was an Idaho corporation which engaged in the business of selling gasoline and related petroleum products. Until 1945 the controlling interest in this company was held by Continental Oil Company. In that year Continental sold all of its Westcott Oil Company stock to C. J. Westcott, who was president of the latter company. Westcott in turn sold a considerable amount of the stock to friends and associates. It was at this time that the taxpayer, Frank N. Mattison, acquired his first interest in the company, consisting of twenty-five shares.

In 1950 C. J. Westcott and the other stockholders of Westcott Oil Company decided to dispose of their stock if a satisfactory price could be obtained. With this purpose in mind, Mr. Westcott entered into negotiations with Continental. When an exchange of shares could not be negotiated, Mr. Westcott offered to sell the Westcott Oil Company stock to Continental for $607.63 a share. This price would have netted Westcott Oil Company stockholders $500 a share after capital gains tax. There was no direct connection between the $500 net price demanded and the value of the operating assets of the company.

A cash sale could not be consummated, however, because Continental was unwilling to pay the price demanded. Mattison learned of the breakdown of negotiations with Continental. He went immediately to Mr. Westcott and obtained oral assurances that he, Mattison, could acquire all of the Westcott Oil Company stock for himself if he could pay the price which had been demanded of Continental. Mattison then went to Continental to negotiate a sale of the operating assets of Westcott Oil Company to Continental if and when Mattison acquired them.

On May 12, 1952, Continental executed a binding offer in favor of Mattison good for thirty days to purchase the operating assets of Westcott Oil Company for one million dollars plus inventory. After obtaining this commitment, Mattison went to the other stockholders of Westcott Oil Company and obtained written options to purchase all of their stock in that company. Mattison exercised these options in writing about May 30, 1952. By June 10, 1952, all the outstanding stock of Westcott Oil Company except the shares owned by Mattison had been deposited with First Security Bank of Idaho as escrow holder. On that date, and pursuant to the escrow instructions, Westcott Oil Company issued to Mattison a new stock certificate for all outstanding shares— 2,189 in all.

Mattison, then being the sole stockholder of Westcott Oil Company, called a special meeting of the stockholders for June 13, 1952. At this meeting it was resolved that the business of the company be discontinued, and that the officers and directors proceed to wind up its business affairs, transfer its assets to the stockholder, and dissolve the company. At a special meeting of the board of directors held immediately afterwards, it was resolved that the operating assets be con-

veyed to Mattison by way of a partial distribution in liquidation. On June 16, 1952, Westcott Oil Company conveyed its operating assets to Mattison. He then reconveyed the same to a wholly-owned subsidiary of Continental.

As consideration for this conveyance of assets, Mattison received checks in the total sum of $1,689,399.07 from Continental and its subsidiary. Of this sum $310,123.89 was paid to the bank in discharge of Westcott Oil Company's obligations to the bank which Mattison had assumed. The stockholders of Westcott Oil Company received $1,347,480.57 in full payment for the stock which Mattison had purchased from them. This left $31,794.61 of the sum paid by Continental. Westcott Oil Company then continued to wind up its business affairs. On May 12, 1953, the remaining assets, consisting of $101,585.76 in cash, were distributed to Mattison. He surrendered his stock certificate and the company was dissolved on June 19, 1953.

In computing his 1952 and 1953 income taxes, Mattison treated the assets of Westcott Oil Company which he received in those years as distributions in liquidation of that corporation. This was done pursuant to section 115(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115(c). When so treated, gain is not considered to be realized until the amounts received on the liquidation exceed the cost basis of the stock of the corporation being liquidated. Accordingly, Mattison, who reports his income on a cash basis, reported a capital gain of

$23,276.29 for 1952.[1] The portion of this gain which was attributable to the twenty-five shares Mattison had held since 1945 was reported as long-term capital gain. The balance of the $23,276.29 was reported as short-term capital gain.

Consistent with this theory, Mattison reported the $101,585.76 received in cash in 1953 in final liquidation of the corporation, less $38.71 expenses, as long-term capital gain in 1953.

The Internal Revenue Service upon audit determined that the operating properties and cash of Westcott Oil Company were received by Mattison as a result of the purchase of corporate assets rather than a distribution in liquidation of the corporation. So viewing the transaction, the Service concluded that $101,585.76 of the price which Mattison paid for the Westcott stock should be allocated to the cash in like amount which Mattison received at the final distribution in 1953. Hence, no capital gain was recognized for 1953.

By the same reasoning, however, the Service increased the capital gain for 1952 by $101,585.76. This sum represents that portion of the total cost of the Westcott stock which the Service had allocated to assets not sold to Continental. The Service treated as long-term capital gain the portion of the 1952 capital gain attributable to the twenty-five shares of Westcott which Mattison had purchased in 1945. The balance of the 1952 capital gain, as restated by the Service, was treated as short-term capital

---

1. Computed as follows:

Received in partial liquidation

| | | |
|---|---|---|
| Physical assets having fair market value of ........ | | $1,689,399.07 |
| Less obligations assumed in the amount of ........ | | 310,123.89 |
| Net receipts .................................... | | $1,379,275.18 |
| Cost of shares surrendered | | |
| 25 shares acquired in 1945 at ..... | $ 4,841.25 | |
| 2164 shares acquired in June 1952 at | 1,347,480.57 | |
| Total basis of shares ........................... | | $1,352,321.82 |
| Gross profit .................................... | | $ 26,953.36 |
| Expenses incurred .............................. | | 3,677.07 |
| Taxable gain ................................. | | $23,276.29 |

gain, since the sale of the physical properties to Continental was consummated immediately after Mattison acquired them from Westcott.

The result was a determination that the taxpayer owed additional taxes in the amount of $69,257.45 for 1952, and was entitled to a refund of $25,859.64 for 1953. This net deficiency of $43,-397.81, with interest in the amount of $10,064.08, was paid by the taxpayer. The judgment from which the Government appeals allows a refund of these sums.

The judgment represents an acceptance by the trial court of the taxpayer's view that the assets of Westcott which Mattison received are to be treated as distributions in liquidation of that company, and not as a purchase of corporate assets. The principal question now before us is whether the trial court erred in adopting this view.

■ Normally, assets received in liquidation of a corporation are treated as being received in exchange for stock. Where such treatment is accorded, the stockholder does not realize gain until the amount (or fair market value of property) received on the liquidation exceeds the cost basis of the stock surrendered.[2] Where, under such circumstances, there are successive corporate distributions in liquidation of the corporation, the present market value of each asset distributed is applied against the total cost basis to the stockholder of his stock. After such cost basis has been recovered, the value of all property thereafter received by way of further distribution is considered one hundred per cent gain.[3]

This is the method which Mattison used and the trial court approved.

■ There is, however, an established exception to the rule giving effect to liquidating distributions, which is known as the Kimbell-Diamond rule. Under this doctrine, when a taxpayer who is interested primarily in a corporation's assets first purchases the stock and then liquidates the corporation in order to acquire the desired assets, the separate steps taken to accomplish the primary objective will be treated as a single transaction. Thus, even though the objective was accomplished in form by a purchase of stock, the substance of the transaction is a purchase of property.[4]

This is the method which the Commissioner contends should have been used by Mattison. Coupling the use of this method with a cost-allocation procedure which will be further discussed below, the Commissioner arrived at the deficiency which he here seeks to reinstate.

2. See section 115(c) of the Internal Revenue Code and other sections of that code referred to therein; section 39.115 (c)–1 of Regulations 118, promulgated by the Commissioner of Internal Revenue under the Internal Revenue Code of 1939.

3. Letts v. Commissioner, 30 B.T.A. 800, affirmed 9 Cir., 84 F.2d 760. See, also, 1 Mertens, Law of Federal Income Taxation § 9.86; 2 P.H. 1959 Fed.Taxes par. 9195–A.

4. This statement of the so-called Kimbell-Diamond rule closely follows the language used in Orr Mills, 30 T.C. 150, decided April 30, 1958. The basic rationale of this rule was first stated in Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588, decided in November 1938. It was followed in Koppers Coal Co., 6 T.C. 1209, decided in May 1946, and somewhat extended in

Kimbell-Diamond Milling Co., 14 T.C. 74, from which decision the rule derives its name. Since then the rule has been frequently applied, sometimes to the advantage of the taxpayer and sometimes to the advantage of the Government. See Ruth M. Cullen, 14 T.C. 368; H. B. Snively, 19 T.C. 850, affirmed, 5 Cir., 219 F.2d 266; Texas Bank and Trust Co. of Dallas, 22 P-H Tax Ct.Mem. par. 53,185, 1953; Kanawha Gas & Utilities Co. v. Commissioner, 5 Cir., 214 F.2d 685; Montana-Dakota Utilities Co., 25 T.C. 408; James E. Suter's, Estate, 29 T.C. 244; Orr Mills, supra; Georgia-Pacific Corporation v. United States, 5 Cir., 264 F.2d 161. In a number of cases the rule has been recognized but found to be inapplicable under the particular circumstances. See John Simmons Co., 25 T.C. 635; Trianon Hotel Co., 30 T.C. 156; Conte Equipment Co., 17 CCH Tax Ct. Mem. 855, 1958–171.

The trial court held the Kimbell-Diamond rule inapplicable under the facts of this case. In effect the court held that this rule applies only where the intent is to acquire physical assets, as such, for use in the taxpayer's business. Hence, acquisition of assets in connection with a liquidation for the purpose of selling the assets at a profit was held not to come under that rule.

Support for the view adopted by the trial court is to be found in a statement made by the Tax Court in Trianon Hotel Co., 30 T.C. 156. After setting out the Kimbell-Diamond rule much as it is stated above, the court there said at page 182 of 30 T.C.:

"This Court has held that the principles enunciated by the foregoing cases do not apply when the acquiring corporation does not intend to integrate the acquired assets into its own operations. John Simmons Co., 25 T.C. 635."

In our view the decision in Simmons did not place such a limitation on the Kimbell-Diamond rule, nor was such a limitation necessary to the decision in Trianon.

The Tax Court in Simmons, after reciting the Kimbell-Diamond rule in its usual form, went on to say:

"* * * the principle enunciated therein [in the Ashland, Kimbell-Diamond, and Kanawha cases, see footnote 6] was intended to be and should be limited to the peculiar situations disclosed by the facts in each of those cases and should not be extended to a case such as this, where the evidence establishes a wholly different origin and reason for the pattern of the transactions."

The Ashland, Kimbell-Diamond, and Kanawha decisions thus referred to were cases in which the physical assets after being acquired were integrated into the business of the acquiring companies.[5] But this was not the distinguishing circumstance to which the court in Simmons was referring when it stated that the rule of those cases should be limited to the "peculiar situations" there disclosed.

The distinguishing circumstance there relied upon was that in Simmons the purpose of the acquisition was to meet a requirement of a loaning bank by gaining control of the other company and continuing the business of the old corporation in a new corporate form accomplished by a merger. In the Ashland, Kimbell-Diamond, and Kanawha cases, as the court in Simmons noted, there was no such purpose. The court did state that in these other three cases the taxpayers had as their sole purpose the purchase of particular assets. But there is nothing to indicate that this appraisal of purpose was made dependent upon the fact that in those cases the acquired properties were integrated into the business of the acquiring taxpayer.

In Trianon the transaction under review was between corporations controlled by the same stockholders. The transaction was not for the purpose of acquiring assets for either use or sale, but to supply certain of the acquired corporation's stockholders with readily available funds which would not be depleted by a dividend tax. The business of the acquired corporation was continued as usual, the properties being operated in the same way as before the transaction. The court found, for this reason, that the underlying purpose of the transaction was not to acquire assets. It follows that there was no occasion for the court in Trianon to consider whether acquired assets must be integrated into the business of the acquiring company in order for the Kimbell-Diamond rule to apply.[6]

5. In Kanawha some of the assets so acquired were thereafter sold. However, it is not indicated that the purchaser had this in mind when the stock of the acquired corporation was obtained.

6. In Conte Equipment Corporation, supra, note 4, also cited by the taxpayer, the purpose of the transaction was not the acquisition of assets but to enable stockholders of the purchasing corporation to

In most of the cases where the Kimbell-Diamond rule has been applied, the assets after being acquired were integrated into the business operation of the acquiring person or company, or the latter's subsidiary.[7] In H. B. Snively, 19 T.C. 850, however, the Kimbell-Diamond rule was applied where the taxpayer acquired the assets, consisting of a citrus grove, so that he could turn them over to his sons when they returned from the war.[8] And in Georgia-Pacific Corporation v. United States, 5 Cir., 264 F.2d 161, the rule was applied where timber was thus acquired for the purpose of being cut and sold.

■ The Kimbell-Diamond rule is not to be applied unless the purpose of the transaction was to acquire the assets of the company whose stock has been purchased. Evidence of such contemporaneous purpose is found where the acquired assets are immediately integrated into the business operations of the purchaser. But to conclude from this that integration must be shown to give application to the rule is to confuse the rule with one method of establishing its applicability.

■ In our opinion, any circumstance which shows that the contemporaneous purpose of the transaction was to acquire the assets calls for application of the rule. Where the objective is to consummate a pre-arranged sale of the assets, the purpose to acquire is just as certainly established as where the objective is to integrate the assets into the business. In both cases the title to the assets must be obtained before the objective can be realized. In both cases the form of the transaction is corporate dissolution but the substance is purchase of property.[9]

In seeking to distinguish the cases which have applied the Kimbell-Diamond rule, the taxpayer points out that here, unlike Ashland, Kanawha, and perhaps some other cases, Mattison acquired the intangible as well as the tangible assets of the company being dissolved.

■ This circumstance, as in the case of the circumstance of integration of operating properties, is a factor to be considered in determining whether the underlying purpose was to acquire physical assets. That it is not necessarily controlling, however, is indicated by the fact that the Kimbell-Diamond rule has been applied in several cases where both tangibles and intangibles were acquired.[10] Moreover, this specific contention was considered and rejected in the Suter and Orr Mills cases.

The taxpayer argues that if the Government's position is accepted the annual accounting concept will be disregarded and income will be taxed to a cash basis taxpayer in a year other than that in which it is received.

This is true if the transaction whereby Mattison acquired the assets of Westcott

---

pay back their advances from the corporation and thereby escape income taxation on such advances. It was also shown that the merger of the two corporations was an afterthought.

7. In addition to the Ashland, Kimbell-Diamond, and Kanawha cases, this is true of Koppers Coal Co., supra, note 4; Ruth M. Cullen, supra, note 4; Texas Bank and Trust Co. of Dallas, supra, note 4; Montana-Dakota Utilities Co., supra, note 4; James E. Suter's Estate, supra, note 4; and Orr Mills, supra, note 4.

8. As a result of the transaction, the taxpayer received a deed to the citrus grove on December 31, 1943, and conveyed the grove to one of his sons on the following day.

9. The rationale of the Kimbell-Diamond rule is that substance must govern over form. Kimbell-Diamond Milling Co., supra, 14 T.C. at page 80; Kanawha Gas & Utilities Co. v. Commissioner, supra, 214 F.2d at page 691. As the court said in Commissioner of Internal Revenue v. Ashland Oil & Refining Co., supra, 99 F.2d at page 591, " * * * taxation is an intensely practical matter, and * * * the substance of the thing done and not the form it took must govern."

10. The Kimbell-Diamond case, from which the rule derives its name, falls in this category. Kimbell-Diamond Milling Co., supra. See, also, the Snively, Texas Bank and Trust Co., Montana-Dakota, Suter, Orr Mills, and Georgia-Pacific cases, supra.

Oil Company is to be deemed a recovery of cost in successive corporate distributions in liquidation. But if that transaction is to be regarded as a purchase of assets, no such difficulty is encountered. In the latter event the capital gains tax which is assessed is for a sale which was made and proceeds which were received in 1952. The final distribution made in 1953 is not taxed in 1952 or in any other year, and hence there is no disregard of the annual accounting concept.

■ The Kimbell-Diamond rule has been applied in solving a wide variety of tax problems.[11] This appears to be the first case, however, in which application of the rule and the accompanying cost allocation urged by the Government would operate to place the capital gain in an earlier annual accounting period than would otherwise be the case. But novelty in this regard does not appeal to us as a reason for disregarding the rule if otherwise applicable. If the facts call the rule into play, the tax consequences should follow, whatever they may be.[12]

It is contended by the taxpayer that the trial court's determination that Mattison in substance purchased the stock of Westcott Oil Company is essentially a finding of fact which this court should not disturb. Jacobs v. Commissioner, 9 Cir., 224 F.2d 412, is cited in support of this view. It was there stated (224 F. 2d at page 413) that "whether for tax purposes several acts constitute separate and distinct transactions or are integrated steps in a single transaction is a question of fact."

Where there is no difference of opinion as to the underlying legal principles, such a question is entirely one of fact. But here the evidence is not in conflict; the difference in views between the parties turns exclusively on the scope and meaning of the Kimbell-Diamond rule.

The form of the transaction was undoubtedly that of a stock purchase. The rule in question starts with that concession. As to substance, however, the undisputed fact is that Mattison first arranged to sell the assets and then purchased the stock so he could consummate that sale. Mattison testified that the securing of the assets of Westcott Oil Company was his "motivating purpose" in acquiring the stock. In the opinion of the trial court, it is stated that "the taxpayer purchased the stock (other than the twenty-five (25) shares he already owned) intending to liquidate the corporation, sell the assets, and thereby make a profit."

■ In our view, the determination which the trial court made was, under these circumstances, a conclusion of law and not a finding of fact. For the reasons indicated above, we believe that this conclusion of law is erroneous. We hold that the Kimbell-Diamond rule is applicable under the facts of this case.

11. For example, in the Ashland and Snively cases the tax problem was to determine whether a taxable event had occurred. The taxpayer argued and the court held that the transaction was a purchase of assets and since the taxpayer did not dispose of them during the tax year there had been no taxable event. In the Koppers, Kimbell-Diamond, Texas Bank and Trust Co., Montana-Dakota, and Orr Mills cases, the tax problem was to determine the cost basis of the acquired property for the purpose of computing depletion, depreciation, or excess profits tax credit in calculating the net income of the acquiring company. In Cullen, the tax problem was whether, as a result of the transaction, the taxpayer had sustained a capital loss which could be carried over. In the Kanawha, Conte, and to some extent the Georgia-Pacific cases, the tax problem was to determine the cost basis of acquired assets which were thereafter sold, for the purpose of computing the capital gain.

12. As the court said in Georgia-Pacific, supra, 264 F.2d at pages 162–163:
"This is another of the many cases in which, hewing to the line and letting the chips fall where they may, the court, deciding now for the government and now for the taxpayer, according to the facts of the particular case, is called upon to apply the controlling principle of what is usually referred to as the Kimbell-Diamond doctrine."

Applying that rule, we think that it is a necessary conclusion of law that the assets which Mattison sold to Continental were acquired by purchase in 1952.

The taxpayer further argues, however, that even granting the application of the Kimbell-Diamond rule the Government's method of calculating and taxing the capital gain resulting from the transaction is impermissible.

This argument is made on the premise that what the Government is seeking to do is assess a 1952 tax upon a gain of $101,585.76 which Mattison did not receive or become entitled to until May 12, 1953, or later. But this is a fallacious premise. The Government is not seeking to tax in 1952 a capital gain which Mattison received in 1953. It asserts only that the cost basis for the tangible assets sold to Continental in 1952 is not the price for all of the Westcott Oil Company stock, but only that part thereof which is reasonably allocable to those assets.

Under the allocation actually made by the Government, a part of that total price equal to the value of the assets distributed in 1953 was assigned to those assets. The result was to decrease the basis of the operating assets sold to Continental in the amount of the cost allocated to the assets distributed in 1953, and thus increase the capital gain in 1952 by the same amount.

The basic principle of cost-allocation which the Government applied is stated in L. M. Graves, 21 P-H Tax Ct. Mem., par. 52,143, 1952, as follows (page 430):

"* * * where consideration is paid for a mixed group of assets a cost basis is to be allocated to each asset based upon its relative value to the whole at the time of acquisition."

The taxpayer urges that this principle is not appropriate under the circumstances of this case because it results in taxing him for a gain in 1952 when the determination of the amount and actual distribution of that gain did not take place until 1953. Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725, is cited as forbidding such a prior determination.

The Security case is not in point. The tax there in question was net income tax for 1935. It was held that an accrual basis taxpayer could not accrue and deduct unpaid and contested expenses because those items constituted indeterminate and contingent expenses in the year accrued.

In the instant case we are concerned with a capital gains tax, the particular problem being to determine the cost basis for calculating the gain, and whether there was a short or long-term holding period. There is no question but that all of the cost was paid in 1952. The Government is not urging that some costs paid in 1952 should be considered as having been paid in 1953. It contends only that some costs paid in 1952 should be regarded as the cost basis for the cash distributed in 1953.

Under the taxpayer's theory, no cost would be attributed to the assets which were converted into $101,585.76 in cash. This would be appropriate if these assets were received as a corporate distribution. But we have already held that they were received by purchase, and the taxpayer's argument on this branch of the case assumes, arguendo, that this is the case.

The taxpayer further argues in effect that there was no reasonable basis on which costs could be allocated at the time they would have to be allocated in order to file a timely 1952 return. The suggestion is that perhaps the amount which the taxpayer would receive on final liquidation was so uncertain, in view of assumed liabilities, that a cost allocation attributable thereto was not reasonably possible when the 1952 return had to be filed.

This question was before the trial court but was not decided because the whole Kimbell-Diamond theory of the Government was rejected. Since we cannot decide this question on the present

record, the cost allocation problem must be referred back to the trial court.

■ The judgment is reversed and the cause is remanded for further proceedings and a judgment consistent with this opinion. The further proceedings shall include a determination, after further hearing if deemed necessary, as to whether a timely allocation of cost as between assets sold to Continental and assets distributed in 1953 was reasonably possible, and if so, whether the allocation *actually made by the Commissioner is reasonable and fair.*