W. Thomas Davis and Elizabeth Lloyd Davis [1] v. Commissioner. Davis v. Commissioner
Docket Nos. 94044 - 94046, 673-63.
United States Tax Court
T.C. Memo 1965-30; 1965 Tax Ct. Memo LEXIS 302; 24 T.C.M. (CCH) 157; T.C.M. (RIA) 65030; February 16, 1965
Arthur A. Armstrong and Laurence K. Brown, Suite 835, Rowan Bldg., 458 S. Spring St., Los Angeles, Calif., for the petitioners. Thomas F. Greaves, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in income tax of petitioners for the following calendar years and in the following amounts: Docket
Calendar
number
year
Petitioners
Deficiency
94044
1953
W. Thomas Davis and Elizabeth Lloyd Davis
$76,534.98
94045
1953
M. Philip Davis and Carolyn L. Davis
84,298.86
94046
1954
M. Philip Davis
5,882.42
673-63
1954
W. Thomas Davis and Elizabeth Lloyd Davis
6,420.81
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether *303 petitioners realized additional ordinary income in 1953 from the sale in that year of lemons to Golden Citrus Juices, Inc.
(2) In the case of petitioners W. Thomas Davis and Elizabeth Lloyd Davis, for the year 1954, what is the proper useful life of trees for the purposes of computing depreciation. Findings of Fact W. Thomas Davis (hereinafter referred to as Tom) and Elizabeth Lloyd Davis, husband and wife residing during the years 1953 and 1954 in Beverly Hills, California, filed joint Federal income tax returns for each of these years with the district director of internal revenue at Los Angeles, California. M. Philip Davis and Carolyn L. Davis, husband and wife residing during the year 1953 in Los Angeles, California, filed a joint Federal income tax return for that calendar year with the district director of internal revenue at Los Angeles, California. M. Philip Davis (hereinafter referred to as Phil) residing during the calendar year 1954 in Los Angeles, California, filed an individual income tax return for that year with the district director of internal revenue at Los Angeles, California. Each of these returns was filed on a cash basis. Tom and Phil (sometimes hereinafter *304 referred to as petitioners) are brothers. They had been engaged in agriculture since 1950 and had owned some lemon acreage since early 1952. Toward the end of 1952 Tom began negotiations on behalf of himself and Phil to acquire the assets of the Del Norte Citrus Company, a corporation (hereinafter referred to as Del Norte). Tom conducted his negotiations with the various stockholders of Del Norte but particularly with the president of the corporation, Jack Culbertson. At the time Tom commenced conducting these negotiations, Phil was on a trip around the world. As a result of these negotiations, in late April or early May, Tom acquired, in the name of Tophil Farms, Inc., a nonoperating corporation wholly owned by Tom and Phil, options to buy all of the stock of Del Norte for a total price of $889,615.27. The operating properties of Del Norte consisted of 428.35 acres of land, 354.26 acres of which were planted with lemon trees of varying ages, and land improvements including irrigation lines, underground tanks, wells, roads, and various buildings and wind machines, useful in connection with the operation of a lemon orchard. This property was located on the Oxnard plain in Ventura *305 County, California. At the time Tom was negotiating for the purchase of the Del Norte properties, he was aware that lemons were in short supply. Lemon trees in the Oxnard plain area produce lemons throughout the entire year and at any time of year lemons in all stages of development are on such trees including lemon blossoms and pea-size fruit through mature fruit. It generally takes from 8 to 10 months for lemons in the Oxnard plain area to mature, and generally the peak period during the year for harvesting mature fruit is in the months of May, June, and July. In May 1953, shortly after obtaining the options to purchase all of the Del Norte stock, Tom went to Europe. He returned from Europe on July 4, 1953, and immediately began to give his attention to raising the cash necessary to complete the purchase of the Del Norte stock. Tom and Phil did not have available the $500,000 in cash needed and planned to raise the cash by using the cash which Del Norte had in the bank and selling certain of the Del Norte assets. The assets of Del Norte which Tom and Phil planned to sell were certain revolving fund certificates which Del Norte owned in various packing houses and the lemons on *306 the trees in the Del Norte orchard (hereinafter referred to as the lemon crop). Tom and Phil planned to keep the Del Norte land and improvements including the orchard and to operate it as a lemon orchard. Immediately after his return from Europe on July 4, 1953, Tom contacted representatives of a number of companies engaged in the manufacture of lemon products such as processing juice lemons for production of lemon concentrates and frozen juice. Tom had his secretary telephone a number of companies listed as fruit juice firms in the yellow pages of the telephone directory to inquire whether the companies would be interested in buying lemons. As a result of these inquiries, six or seven individuals expressed an interest in purchasing the lemons which Tom had said he would have for sale. During July and August 1953, Tom conducted verbal negotiations with these various representatives of lemon processing companies. Tom explained to the various individuals with whom he conducted negotiations that he was acquiring the Del Norte orchard and was desirous of selling the lemon crop on the trees. During the course of these negotiations Tom showed the past production records of the orchard *307 to the various individuals with whom he was negotiating. During the course of the negotiations, Tom became aware that a number of processing plants did not have sufficient lemons available to meet the commitments which they had for juice and were anxious to buy the entire crop on the trees of the Del Norte orchard for juice purposes. Tom was asking $2.50 per box for the lemons on the trees. Tom had several offers of $2.00 per box for the Del Norte lemons, but he did not wish to sell the lemons to a purchaser that already had arrangements for packing house facilities for the lemons since Tom was in the process of acquiring a packing house in a related transaction where he wished to process the lemons from the Del Norte orchard to help keep the packing house busy. Two of the people with whom Tom was negotiating for the sale of lemons were Tom Eadington and Phil Twombley, the president and vice president, respectively of Golden Citrus Juices, Inc. (hereinafter referred to as Golden Citrus). This corporation was owned one-third by Minute Maid Corporation and one-third by each of two other corporations, but Minute Maid had an option to acquire an additional one-third of the stock of *308 Golden Citrus. Golden Citrus had a contract with Minute Maid to supply all of its needs for lemon juice and lemon products packed under the Minute Maid and Snow Crop labels. In the summer of 1953 frozen lemonade was a relatively new product and was increasing in popularity, and Minute Maid was short of frozen lemon products to meet its customers' demand which caused it to put pressure on Golden Citrus for additional supplies of juice. Prior to the first part of July 1953, neither Eadington nor Twombley knew either Tom or Phil, and Golden Citrus had had no previous dealings with either Tom or Phil. During the latter part of August or early part of September 1953, Tom came to a verbal agreement with Eadington and Twombley as representatives of Golden Citrus whereby Tom agreed to transfer the Del Norte lemon crop to Golden Citrus as soon as he and Phil acquired title thereto for $2.00 a box of merchantable lemons picked during the succeeding 9 months with the understanding that a representative satisfactory to both parties would subsequently estimate the number of boxes of lemons set on the trees in various stages of development from pea size up to and including mature fruit. The *309 representatives of Golden Citrus and Tom by agreement selected John S. Bell, a packing house manager experienced in estimating crops, to make a block by block survey and estimate of the lemon crop set on the trees of the Del Norte orchard at the beginning of September 1953. Bell estimated that the lemon crop then set on the trees in various stages of maturity from pea size to full size, which would be harvested over a 9-month period, would fill 118,850 field boxes of lemons when harvested. Since there would continuously be lemons picked and freshly setting, Bell considered that his estimate would be valid as of any date prior to the end of October 1953, with respect to the crop then set to be harvested within 9 months after the date selected. Bell submitted his report as to his estimate in writing to Tom, and this estimate was accepted and relied on by both Tom and the representatives of Golden Citrus. Twombley and his staff at Golden Citrus calculated that lemons were worth about $2.54 a box net to the grower on the tree in mature condition. Twombley therefore considered that by purchasing lemons on the Del Norte orchard for a total price of $237,700, arrived at by multiplying $2.00 *310 per box by the estimated harvest of 118,850 boxes, Golden Citrus would make profit on the lemons themselves as well as maintain a much needed supply of lemons. The oral understanding reached by Tom and representatives of Golden Citrus was that Golden Citrus would buy the lemon crop in its condition as then set on the trees of the Del Norte orchard for $237,700 cash, Golden Citrus to take all risk of loss or damage to the crop. Eadington and Twombley then secured the approval of the board of directors of Golden Citrus and the principal stockholders of Golden Citrus to the purchase of the lemons in the Del Norte orchard for cash. Around the first of September 1953, Phil returned from his European trip and became involved in the proposed sale of the lemons in the Del Norte orchard to Golden Citrus. After discussing the prospective 1953-1954 lemon crop and demand for lemons with Tom, Phil came to the conclusion that he and Tom should have some interest in the profit that Golden Citrus might realize upon the re-sale of the lemons from the Del Norte orchard. Tom agreed with this and he and Phil decided that they should receive whatever profit Golden Citrus made over and above its $5.00 *311 per ton processing fee upon its re-sale of lemons from the Del Norte orchard. Tom and Phil presented this proposition to Eadington and Twombley. Because of its desperate need for lemons, Golden Citrus agreed to purchase the Del Norte lemons under this condition but insisted that if it agreed to this condition, there should be inserted into the agreement in return therefor an agreement that the seller would guarantee Golden Citrus as a minimum number of boxes of merchantable lemons set on the trees of Del Norte orchard the 118,850 boxes that had been estimated to be on the trees by Bell. On September 12, 1953, Tom and Phil entered into a written contract with Golden Citrus for sale of the lemon crop. This contract provided in part as follows: WHEREAS, Sellers are in the process of acquiring all of the stock (hereinafter referred to as the stock) of Del Norte Cirtus Company (hereinafter referred to as Del Norte); and, WHEREAS, Sellers intend to dissolve Del Norte upon acquiring the stock, as aforesaid, and to distribute all of its assets, including 428 acres of lemons in Ventura County (hereinafter referred to as the lemon orchard) to its stockholders; and, WHEREAS, the parties *312 hereto have had a survey made of the lemons presently set on the lemon orchard and have determined there are approximately 118,850 Culbertson Lemon Association field boxes of lemons so set on the lemon orchard (which lemons so set shall hereinafter be referred to as the lemon crop); and, WHEREAS, Purchaser desires to buy and Sellers desire to sell the lemon crop as and when Sellers acquire title to the lemon orchard, on terms and conditions hereinafter provided, NOW, THEREFORE, in consideration of the premises and of the covenants of the parties hereinafter contained, IT IS HEREBY AGREED AS FOLLOWS: I. That as soon as the Sellers acquire all of the stock of Del Norte, as aforesaid, they shall do everything necessary and proper to dissolve Del Norte and distribute its assets to its stockholders. II. That as soon as Sellers acquire title to the lemon orchard, Sellers shall sell to Purchaser, and Purchaser shall buy from Sellers, the lemon crop at and for the following purchase price, to wit: (a) $237,700 in cash, payable through escrow as provided for herein, and, (b) A sum equal to the net profit, if any, made by Purchaser on the re-sale of the lemon crop, payable in *313 cash immediately upon the determination of such profit by Purchaser, but under no circumstances later than December 15, 1954. That the term "net profit" as used herein shall not be deemed to include any profit which Purchaser makes from processing fees. III. That Sellers shall forthwith open an escrow with Bank of America NT & SA, Beverly Hills Branch,(hereinafter referred to as the lemon escrow). That the closing date of the lemon escrow (hereinafter referred to as the lemon closing date) shall be the same date as the date on which Sellers acquire title to the lemon orchard. That Sellers shall advise Purchaser in writing of the lemon closing date and of the time on said date set for closing, at least 3 days prior to the lemon closing date. IV. That immediately upon opening the lemon escrow, Sellers shall deposit therein, a Bill of Sale to the lemon crop in favor of Purchaser duly executed by Sellers, with written instructions by the Sellers to deliver the same to Purchaser on the lemon closing date after title to the lemon orchard has vested in Sellers, upon payment of $237,700 in cash to Sellers. V. That within 5 days after the opening of the lemon escrow, Purchaser shall *314 deposit therein $237,700 in cash with written instructions duly signed by the Sellers to deliver said $237,700 to the Sellers on the lemon closing date, after title to the lemon orchard has vested in Sellers, upon delivery of the Bill of Sale for the lemon crop duly executed by Sellers in favor of Purchaser. * * *
VII. That Sellers shall and by these presents do hereby warrant that there are at least 118,850 Culbertson Lemon Association field boxes of lemons presently set in the lemon orchard and that Purchaser will be able to pick that number of merchantable lemons from the lemon orchard prior to the close of business June 30, 1954. That if for any reason beyond the reasonable control of Purchaser, Purchaser is unable to pick 118,850 boxes of merchantable lemons from the lemon orchard by June 30, 1954, Purchaser shall have and is hereby granted the right to continue picking merchantable lemons from the lemon orchard until such time as Purchaser has picked 118,850 boxes. VIII. That Sellers shall at their own cost and expense, maintain the lemon orchard in good condition and shall cultivate, fertilize, pest and frost control and otherwise do everything reasonably necessary *315 to maintain it in good and healthy production. * * *
That Purchaser shall have the right to inspect the lemon orchard and pick the lemon crop or any part thereof at any and all reasonable times. * * * It was not customary for Golden Citrus to obtain lemons by acquiring the entire lemon crop of an orchard, nor was this a customary method of acquisition in the lemon industry generally. It is customary for a contract to purchase a growing crop to carry a provision that the seller will at his expense cultivate the crop to maturity. The respresentatives of Golden Citrus considered this provision in the contract to be valuable. Under date of September 8, 1953, Tophil Farms, Inc., assigned its option to purchase all of the Del Norte stock for a total consideration of $889,615.27 to Tom and Phil. On September 17, 1953, Golden Citrus deposited $237,700 in a Bank of America escrow account opened by Tom and Phil and referred to as the lemon escrow. At about the same time Tom and Phil opened three other escrow accounts at the Bank of America, one of which also dealt with the purchase by Tom and Phil of the Del Norte stock. On or about September 22, 1953, Tom and Phil exercised the *316 options to purchase the Del Norte stock. The various escrow accounts had been set up in such a manner that Tom and Phil were able to acquire the Del Norte stock and liquidate the corporation and transfer the assets to themselves as individuals. For the purchase of the Del Norte stock, Tom and Phil used, in addition to the $237,700 placed in escrow by Golden Citrus, certain cash in the bank account of Del Norte which in part was placed therein as a result of the purchase by Tom and Phil on September 21, 1953, of certain revolving fund certificates owned by Del Norte. The dissolution of the corporation and distribution of its assets to Tom and Phil occurred on or about September 22, 1953, the date of the exercise of the options by Tom and Phil. A bill of sale for the lemon crop to Golden Citrus dated September 24, 1953, was executed by Tom and Phil and delivered to Golden Citrus when the lemon escrow account was closed. This bill of sale provided: FOR $237,700.00 in cash paid on the execution of this Bill of Sale, and other valuable consideration, receipt of which are hereby acknowledged by the undersigned, the undersigned shall and by these presents do hereby sell, assign, set *317 over and transfer unto GOLDEN CITRUS JUICES, INC., 118,800 Culbertson Lemon Association field boxes of lemons presently set upon the property formerly owned by Del Norte Citrus Company and described in Exhibit A attached hereto and made a part hereof by reference. The undersigned hereby warrant title to said lemons and will defend said title against any adverse claims thereto at the undersigned's sole cost and expense. That this Bill of Sale is given pursuant to and under the terms of that certain Agreement dated the 12th day of September, 1953, by and between the undersigned as Sellers, and Golden Citrus Juices, Inc. as Purchaser. It was the understanding of Tom and Phil and of Golden Citrus that the use of the words, "118,800 Culbertson Lemon Association field boxes of lemons" in the bill of sale was referring to the estimated pick but was not a limitation, and that the title to the entire lemon crop of the Del Norte orchard set on the trees at September 24, 1953, was transferred by Tom and Phil to Golden Citrus. By June 30, 1954, the final date specified in the agreement of September 12, 1953, for picking of lemons by Golden Citrus, that company had picked over 142,000 field *318 boxes of lemons. Subsequently, a dispute arose between Tom and Phil and Golden Citrus in which Golden Citrus claimed that a part of the crop belonging to it had been pruned off of the trees in early 1954 by employees of Tom and Phil. This dispute was compromised by an agreement of February 24, 1955, whereby Golden Citrus was permitted to pick an additional 15,000 boxes of lemons from the Del Norte orchard during 1955 to compensate for the portion of its crop lost by pruning. The provision for profit on the re-sale of lemons in excess of the $5 processing fee of Golden Citrus being returned to Tom and Phil did not result in any payment to Tom and Phil since the price of lemons declined and Golden Citrus did not make a profit on re-sale of the lemons. Immediately after the dissolution of Del Norte on September 22, 1953, and the transfer of its assets to Tom and Phil, these two brothers formed a corporation known as the Del Norte Lemon Company to manage the Del Norte orchard. This company had no assets and little if any income. All of its expenses in the operation of the Del Norte orchard were paid by Tom and Phil who deducted such amounts on their respective individual income tax *319 returns. A reasonable value for the provision in the agreement dated September 12, 1953, for the sale by Tom and Phil of the lemon crop to Golden Citrus that the sellers "shall at their own cost and expense, maintain the lemon orchard in good condition and shall cultivate, fertilize, pest and frost control and otherwise do everything reasonably necessary to maintain it in good and healthy production" is $25,000. The fair market value of the land including mineral rights, improvements, buildings and trees without reference to the lemon crop set thereon received by Tom and Phil through exercise of the option to purchase the stock of Del Norte was $823,300 as of September 22, 1953. Commencing about September 1955 Tom and Phil received oil royalty payments of $5 per acre for the 428 acres of the Del Norte orchard. During the last 10 years this property has been under oil leases paying $5 per acre for 3 or 4 years. The fair market value of the entire lemon crop harvestable over the succeeding 9 months set on the trees of the Del Norte orchard on September 24, 1953, was $212,700. On their individual income tax returns for the year 1953 Tom and Phil each reported the purchase of the *320 Del Norte stock and the distribution of the assets to themselves in substantially the same manner. The following statement was attached to the return of each: Purchase escrow
Cash paid stockholders
$472,392.00
Notes payable to stockholders
305,444.00
Wm. L. Ross note
35,291.67
Selma Culbertson note
50,000.00
Alexander Rosky note
4,100.00
Escrow charges
1,030.80
$868,258.47
W. T. and M. P. Davis, Tenants-in-common A/C bank
of A. Levy, Inc.
Corporation income tax
$ 1,356.60
Secretarial and escrow services
500.00
Stockholders meeting expense
487.98
Title insurance, etc.
919.00
3,263.58
Other
Property taxes: First half paid in 1953
$5,296.61
Second half paid in 1954
5,296.61
$ 10,593.22
Legal fees
2,500.00
Cash (paid into Del Norte Citrus Co. Bank Account
to cover liabilities)
5,000.00
$ 18,093.22
Total cost of assets acquired
$889,615.27
Allocation to net quick assets
Cash distributions: 9/22/53
$157,775.79
10/ 7/53
8,534.45
11/ 2/53
3,750.00
9/30/53 P/R Checks #15859-15879
1,521.41
9/22/53 petty cash fund
1.78
12/31/53 cash in bank-general A/C
29.73
12/31/53 Cash in bank-P/R A/C
18.84
$171,632.00
Accounts receivable: Alex Gonzales
$ 185.00
Culbertson Lemon Ass'n
14,613.06
14,798.06
Inventory
Lemons-Buenaventura Lemon Co.
$ 32,764.43
85,000 gals. oil
6,031.26
Lemons on trees
237,700.00
276,495.69
Deposit on trees
900.00
$463,825.75
Less: Liability due Tom Eadington
$ 2,083.10
Total cost allocated to net quick assets
$461,742.65
Sale of assets by W. T. and M. P. Davis to Del Norte
Lemon Co.
Weed sprayer
$ 216.95
Tree sprayer
130.17
Tools and implements
650.86
1951 Ford truck
1,214.93
1947 Ford truck
43.39
1947 Ford truck
43.39
1948 Ford truck
216.95
1949 Ford truck
303.73
Brush cutter
1,214.93
Total cost allocated to Del Norte lemon assets
4,035.30
Allocation to assets retained by W. T. and M. P. Davis
Est. life
in years
Land
$179,375.86
Land improvements (irrigation lines, underground
tanks, domestic well, roads, etc.)
10
9,068.59
Buildings
5
6,855.68
Trees
8.8
192,783.49
Storage tanks (2)
10
3,124.11
Pumping plant
5
954.59
Windmachines (24)
6
30,893.96
D-2 tractor
3
390.52
D-4 tractor
3
390.52
Total cost allocated to assets retained
$423,837.32
Total cost allocated
$889,615.27
*321 On September 21, 1953 M. P. and W. T. Davis, acting as tenants-in-common, completed purchase of all of the Capital Stock of Del Norte Citrus Co., a California farming corporation, and immediately liquidated that corporation, taking distribution of all its assets and assuming its liabilities, except that a small amount of cash was allowed to remain in the corporate bank account to discharge current corporate liabilities and expenses of winding up (which was accomplished forthwith). The sole object of acquiring the stock of Del Norte Citrus Company was to acquire its assets immediately and that purpose was accomplished as planned. Plans for acquisition of assets through dissolution as aforesaid, were completed prior to completion of the stock purchase, and the completion of that purchase and corporate dissolution were handled as steps in the same escrow proceedings. Accordingly, under applicable tax precedents, it is considered that there was an integrated series of steps amounting to a single transaction for the purchase by the Davises of the assets of Del Norte Citrus Co. The cost of these assets, and the allocation of that cost to individual assets or groups of assets, are *322 set forth in the foregoing schedule. W. T. and M. P. Davis, acting individually, sold certain of the assets thus acquired immediately or shortly after their acquisition of such assets, and the fact of such prompt disposition for cash is considered to call for first allocation of cost to such items sold, along with other quick assets, such as cash and accounts receivable. Accordingly, the following sales of assets by W. T. and M. P. Davis are recorded, but involve no gain or loss: Date
Cost and
Description
acquired
Date sold
selling price
Farm equipment (see above schedule)
9/21/53
9/22/53
$ 4,035.30
Lemons upon trees
9/21/53
9/21/53
237,700.00
Lemons in warehouse
9/21/53
Various to
32,764.43
10/31/53
40,200 gals. oil
9/21/53
12/ 1/53
4,244.12
Cost over and above that allocated to quick assets was allocated to other assets essentially according to most recent property tax assessments with some further breakdowns and variations as dictated by particular circumstances. Respondent in his notice of deficiency addressed to each petitioner for the year 1953 increased the reported income of each by $101,429.50 with the following explanation: *323 The loss claimed on your return in the amount of $32,366.36 which is your 50% distributable share of operations of a farm shown on the return as M. Philip and W. Thomas Davis tenants in common, is converted to a gain. The adjustment represents a reduction in the cost of certain lemons sold from $237,700.00 to $34,841.00 or by $202,850.00 of which your 50% distributable share is as shown by this adjustment. It is held that the fair market value of the growing lemons, including matured and immatured fruit, received in liquidation of Del Norte Citrus Company was overstated by the tenants in common. Respondent also increased the income of each petitioner by an amount which represented a decrease in the allowance for depreciation claimed on the assets received in the liquidation of the Del Norte Company with the following explanation: The profit from the farm identified in adjustment (a) is further increased by depreciation expenses disallowed due to an increase in the fair market value of the depreciable assets received in liquidation of Del Norte Citrus Company and to denial of the declining balance method of depreciation at twice the straight line rate claimed in the return for *324 those and other assets, and the substitution therefor of the straight line method of depreciation. The adjustment made under sections 23(1), 23(m) and 41 of the Internal Revenue Code of 1939 is computed as follows: Depreciation claimed on the re-
turn
$10,115.99
Depreciation allowable
7,197.61
Adjustment on above
$ 2,918.38
For the year 1954 respondent increased the reported income of each of the petitioners Tom and Phil by decreasing the deduction claimed for depreciation, a part of the adjustment being with respect to the assets received by Tom and Phil on the liquidation of Del Norte The parties have now agreed that Tom and Phil are entitled to use a declining balance method of depreciation based on 150 percent instead of the 200 percent claimed by petitioners and that if the Court holds that the portion of the purchase price paid by Tom and Phil for the Del Norte stock allocable to the lemons on the trees is less than the $237,700 contended by petitioners to be allocable thereto, that the amount of gain on the sale of the lemon crop determined may be prorated to the other assets acquired by Tom and Phil on the basis used for proration by petitioners in their *325 returns. Tom and Phil no longer contest the useful lives for the various assets used by respondent in his computation, except for the year 1954 in the case of petitioners W. Thomas Davis and Elizabeth Lloyd Davis. Tom contends that for the year 1954 respondent has used a useful life of 16.275 years for the lemon trees as compared to the useful life of 8.04 years used in the deficiency notice issued to each Tom and Phil for the year 1953 and in the deficiency notice issued to Phil for 1954. Opinion Tom and Phil take the position that when an aggregate of assets is purchased for a total amount without specification as to the purchase price of each, and one is sold at purchase and the cash applied to the purchase price for the aggregation, the economic consequence is to reduce the price for the retained assets and therefore no taxable gain is realized upon the asset converted to cash. Petitioners state that when various properties are acquired as a whole for a lump sum without specification as to the amount paid for each property, the total price paid is reduced by cash or its equivalent prior to making an allocation of the total price to the remaining assets and that any asset *326 sold immediately after its acquisition should be considered as the equivalent of cash. Respondent takes the position that there is no support in the law for treating the proceeds of the sale of any asset which is sold at the time of purchase as cash or its equivalent and allocating only the remaining purchase price for all the assets to those retained. It is respondent's position that the basis of the assets sold must be determined and that the amount received in excess of such basis represents taxable gain to the taxpayer making the sale, even though the sale is made immediately after the purchase and is arranged for prior to completing the purchase of the assets. Respondent takes the position that the basis of the lemon crop sold by Tom and Phil was $34,841, which respondent determined to represent the fair market value of the lemons at September 24, 1953. Both parties accept as the total basis of all properties acquired by Tom and Phil from Del Norte the amount of $889,615.27 paid by petitioners for the Del Norte stock. See Kimbell-Diamond Milling Co., 14 T.C. 74 (1950), affd. 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 324 U.S. 827, *327 and United States v. Mattison, 273 F. 2d 13 (C.A. 9, 1959). Petitioners on their income tax returns treated, in addition to lemons on trees, a total of $224,042.65 as allocable to "net quick assets" received upon the liquidation of Del Norte and the amount of $4,035.30 as allocable to assets sold to Del Norte Lemon Company. Respondent in his notices of deficiency did not change these allocations. The evidence shows that these "net quick assets" consisted of inventory of lemons in a warehouse, oil inventory, a small amount of cash in a general bank account of Del Norte and in its petty cash fund, certain accounts receivable, and cash which had come from the purchase the prior day by petitioners of certain revolving fund certificates which were owned by Del Norte. Since neither party contests the allocation of $224,042.65 to "net quick assets" and $4,035.30 to assets sold to Del Norte Lemon Company out of the purchase price of $889,615.27 paid by petitioners for the Del Norte assets, we do not consider any issue to be presented with respect to this allocation and consider that the parties agree that the total of these two amounts of $228,077.95 is to be deducted from *328 the $889,615.27 prior to making any allocation to other assets of the remaining purchase price. [2] There have been opinions in which this Court has approved an allocation of a composite price paid for a number of assets including cash arrived at by reducing the composite purchase price by the total of the cash plus items such as prepaid insurance, cash surrender value of life insurance, and in some cases inventories, and attributing the remainder of the price to the other assets acquired on some prorated basis. See, for example, Farmers Cotton Oil Co., 27 B.T.A. 105 (1932), and Apex Brewing Co., 40 B.T.A. 1110 (1939). From this method of allocation there has apparently arisen a reference to a reduction of a composite price by "cash or its equivalent" [3] before allocation of the remaining portion of the price to other assets, the theory being that there results "no gain or loss in the trasfer of cash." Williams v. McGowan, 152 F. 2d 570 (C.A. 2, 1945). In the instant case, accepting the proposition advanced by petitioners that in making the allocation of the composite price paid by petitioners for the Del Norte assets among the various assets *329 acquired, the total price should be reduced by cash or its equivalent, we do not agree with petitioners that the lemon crop was the equivalent of cash to any greater extent than any of the other assets they acquired. There is nothing in the evidence which indicates that it would not have been possible for petitioners to sell immediately after purchase all of the assets which they acquired from Del Norte. However, such a sale of all of the assets would not cause those assets to be the "equivalent of cash" so as to result in no gain or loss from the sale being recognized for income tax purposes. Cf. United States v. Mattison, supra.
*330 Petitioners contend that their argument that the lemon crop here sold was the equivalent of cash is supported by our holding in Apex Brewing Co., supra. In that case we held that in determining the basis for depreciation of fixed assets, there should first be assigned to a beer inventory acquired with such assets for a composite price its market value, and the remaining purchase price allocated among the depreciable assets. The factual situation in that case differs from the situation in the instant case. In that case, since the contract of sale fixed no specific sum for each separate asset transferred, respondent had allocated the purchase price to the various assets acquired by apportioning it according to the original cost of those assets to the transferor as compared to the total price paid for the assets. This resulted in only approximately one-half of the cost to the transferor of the beer inventory being considered as its basis to the purchaser even though the facts showed that this beer had a readily ascertainable fair market value greatly in excess of the basis allocated to it. On the facts we held the fair market value of the beer inventory to be its basis *331 to the purchaser and the basis of the remaining assets to be arrived at by allocating the remaining purchase price after deducting therefrom the basis allocated to the beer inventory. There is nothing in the opinion to suggest that we considered this beer inventory to be the equivalent of cash. However, petitioners' interpretation of the Apex Brewing Co. case, that inventory is the equivalent of cash, does not support petitioners' position here. A growing crop of citrus fruit is not property of a type properly includable in inventory. Ann Edwards Trust, 20 T.C. 615 (1953), affirmed per curiam 217 F. 2d 952 (C.A. 5, 1955), certiorari denied 349 U.S. 905 (1955). In T. H. Symington & Son, Inc., 35 B.T.A. 711, 737 (1937), we held that the taxpayer realized a gain upon redemption of certain shares of preferred stock and bonds acquired by purchase with other assets at a composite price 13 days before they were redeemed. The bonds were never actually transferred but the amount received on their redemption was paid over by the prior owner thereof *332 in reduction of the purchaser's loan obtained to complete the transaction. We there refused to agree with an argument made by the taxpayer that "The entire transaction must be viewed as a purchase * * * of whatever assets remained after the liquidation of all liabilities and any assets which were liquidated during the course of the general liquidation did not give rise to any profit or loss but merely tended to increase or reduce the cost * * * of the assets finally take over." Likewise in Nathan Blum, 5 T.C. 702, 709 (1945), we refused to accept the taxpayer's contention that no gain or loss should be recognized on the disposition of a portion of property acquired as a whole where the disposition was in the 2-month period following the acquisition. In so holding we stated: * * * Petitioner's argument, in a slightly different guise, is in all material respects the same argument that has many times in the past been refuted; that is to say, that where property is acquired as a whole, gain or loss is not realized until it is all disposed of, even though it be disposed of in parcels. Such contentions are inconsistent with the theory of the tax laws, which are designed to *333 levy taxes upon gains and profits of business for annual periods. Heiner v. Mellon, 304 U.S. 271. It is now well settled that where property is acquired as a whole, for a lump sum, and subsequently disposed of a portion at a time, there must be an allocation of the cost or other basis over the several units (except where apportionment would be wholly impracticable) and gain or loss computed and reported upon the disposition of each part. See Santa Maria Gas Co., 10 B.T.A. 1412; O. H. Himelick, 32 B.T.A. 792; Bancitaly Corporation, 34 B.T.A. 494; T. H. Symington & Sons, Inc., 35 B.T.A. 711; cf. Heiner v. Mellon, supra. In effect, petitioners' argument that any assets sold shortly after their purchase and pursuant to a contract made prior to the purchase should not have any gain or loss recognized is likewise an argument that the determination of gain or loss should await the disposition of all assets. Even though we do not agree with petitioners that no gain or loss was realized upon the sale of the lemon *334 crop, neither do we agree with respondent that his determination of $34,841 as the fair market value of the lemons sold is correct. This figure might be considered as a fair estimate of the market value of the mature lemons on the trees as of September 24, 1953. The evidence, however, shows that what petitioners sold was the entire crop on the trees and not just the mature lemons set thereon. As petitioners argue, it has been recognized in a number of cases that a growing crop not yet matured has a fair market value. Watson v. Commissioner, 345 U.S. 544 (1953), affirming 197 F. 2d 56 (C.A. 9, 1952), affirming 15 T.C. 800 (1950); Williams v. Commissioner, 256 F. 2d 217 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court; Smyth v. Cole, 218 F. 2d 667 (C.A. 9, 1955); and Triple E. Development Co., 20 T.C. 619 (1953). What petitioners sold in this case was the entire crop of lemons. The best method available from the facts of record here of allocating the composite purchase price between the growing lemons *335 and other assets purchased after deducting from such composite price the amount that both parties have recognized as being applicable to "quick assets" and "assets sold to Del Norte Company" is on the basis of the relative fair market value of the assets acquired. Petitioners argue that the fair market value of the lemon crop was the entire $237,700 paid therefor in cash by Golden Citrus. Petitioners state that the guarantee that there would be produced 118,850 boxes of lemons was in return for the buyer's agreement to return a portion of the profit from its disposition of the lemons and that there was no amount of the price assignable to petitioners' agreement to keep the orchard in condition to have the fruit properly mature. We agree with petitioners that the evidence in the instant case shows that the guarantee of at least 118,850 boxes of lemons was in return for the buyer's agreement under certain circumstances to return to petitioners a portion of its profit. Respondent apparently also recognizes this for he has requested a finding of fact that: * * * Thus, petitioners decided that they should receive whatever profit Golden Citrus made over and above its $5.00 per ton processing *336 fee upon its re-sale of these Del Norte lemons, and petitioners presented this proposition to Edington and Twombly of Golden Citrus. Thereafter, Golden Citrus agreed to purchase the Del Norte lemons under such a condition because of its "desperate need of lemons," but it insisted that another condition be inserted into the agreement by way of a quid pro quo, namely, that petitioners would agree to guarantee Golden Citrus as a minimum number of boxes of merchantable lemons the estimate of lemons "set on the trees" of the Del Norte orchard that one John C. Bell would make. Not only does the price of $2 a box paid by Golden Citrus indicate a fair market value of the lemons of that amount less whatever value should be assigned to petitioners' agreement to maintain the orchard in proper condition for the fruit to be picked but also other offers received by petitioners for the lemons confirmed such a fair market value. [4] Although the evidence is not clear, apparently the other offers would also require petitioners' maintenance of the orchard. A number of witnesses testified as to the cost of maintaining the orchard which is properly allocable to the fruit set on the trees as compared *337 to the care taken of the trees to keep them in proper condition to produce new fruit. Petitioners argue that their witness who estimated the cost applicable to the lemons set on the trees to be approximately $25,000 made a high estimate. Petitioners state that the estimated amount per acre by certain other of their witnesses as required to care for the maturing fruit is a more accurate estimate of such costs. However, the witness who made the allocation of petitioners' actual costs between fruit and orchard care in arriving at the $25,000 figure stated that petitioners' costs were low as compared to the costs of some other producers. *338 We have determined from all the evidence that $25,000 is a fair value of petitioners' agreement to maintain the orchard. Even though the $25,000 is approximately the amount estimated by one of petitioners' witnesses as petitioners' actual cost of cultivating the lemons to maturity our conclusion is not based solely on his testimony of an allocation of petitioners' actual costs incurred during the period October 1, 1953, through June 30, 1954, since the fair value of the agreement to cultivate the lemons would not necessarily be the amount of the actual costs subsequently incurred. The amount of $25,000 is our best estimate of the fair value of this agreement based upon a consideration of all the evidence. We have therefore concluded that the fair market value of the lemon crop sold by petitioners to Golden Citrus was $212,700 as of the date petitioners received all the assets of Del Norte, September 22, 1953. We have determined that the fair market value of all the other assets, except those with respect to which respondent accepts the valuation used by petitioners on their returns, was $823,300. There is no substantial disagreement between respondent's and petitioners' expert *339 witnesses with respect to the valuation of the other assets except for the trees which respondent's expert valued at a little over $230,000 and petitioners' expert valued at $508,000. We have accepted the valuation of respondent's expert witness of the trees, since his valuation gave little consideration, if any, to the fruit set on the trees which we are separately valuing. In addition to the value of the land itself, respondent's expert placed a value on the mineral rights in the land. This is the major difference between respondent's and petitioners' witnesses' valuation of the 428 acres of land which petitioners obtained from Del Norte. Respondent's witness's valuation was to a large extent based on comparable sales, which presumably included the mineral rights. We have accepted the valuation of petitioners' expert witness of the land. By adding the $212,700 value of the lemon crop to the $823,300 value of the other assets acquired, we arrive at a total of $1,036,000 for the assets purchased by petitioners from Del Norte for $661,537.32. [5] It is apparent that the composite purchase price is approximately 64 percent of the composite fair market value of the assets acquired. We *340 therefore hold that the amount paid by petitioners for the lemon crop which they sold for $237,700 is 64 percent of the $212,700 fair market value of that crop or $136,128 and that petitioners realized a gain upon the sale of these lemons of the difference between this cost thereof to them and the $237,700 sales price they received or $101,572. The remaining issue is the proper useful life of the trees to be used in determining depreciation in the case of petitioner W. Thomas Davis for the year 1954. There is no explanation in the record as to why respondent used a different useful life for the trees for the year 1953 in the case of both Tom and Phil in Phil's case for the year 1954 from that used in determining depreciation in the case of Tom for the year 1954. The evidence shows that there was no difference in the trees and the same useful life should be used. On the basis of petitioners' concession of the correctness of the useful life of the trees as determined by respondent except in the case of Tom for the year 1954 and the evidence in the record, we determine that the useful life used by respondent for the year 1953 for both Tom and Phil and in the case of Phil for the year *341 1954 is the proper useful life to be used in the case of Tom for the year 1954. In view of the agreements made by the parties at the trial and the concessions in petitioner's brief, this is the only remaining issue with respect to the propery depreciation to be deducted by petitioners. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: M. Philip Davis and Carolyn L. Davis, Docket No. 94045; M. Philip Davis, Docket No. 94046; and W. Thomas Davis and Elizabeth Lloyd Davis, Docket No. 673-63.↩
2. Counsel for respondent at the trial insisted that respondent's position was that the entire $889,615.27 should be allocated to all the assets acquired and he specifically refused to agree with any portion of petitioners' allocation except that he did agree to petitioners' method of allocating whatever amount is property to be allocated among the assets retained by petitioners at the time of their purchase of the Del Norte stock and liquidation of that corporation. Respondent's counsel was apparently contending that the fair market value of the lemon crop should be arrived at by what remained of the total purchase price after deducting therefrom the fair market value of all other assets acquired. In the notices of deficiency the only adjustments made in 1953 are of the profit on sale of the lemons and depreciation. Respondent in his pleadings made no affirmative allegations. We therefore consider that there is no issue as to the cost of the other assets which petitioners claimed as "quick assets' and assets sold to Del Norte Lemon Company, or as to whether the amount allocated thereto should be deducted from the total purchase price in considering the proper basis of all the other assets. At times we refer to the parties recognizing or agreeing that the amount allocated by petitioners to these "quick assets" and assets sold to Del Norte Lemon Company should be used to reduce the total price paid by petitioners for all the Del Norte assets since we so interpret the notices of deficiency and respondent's agreement as to allocation for purposes of depreciation. Respondent's position in this respect was not clarified at the trial or on brief. Respondent's position could be interpreted to be that if we determine a fair market value of the lemon crop sufficiently in excess of that determined by him, that when it is added to the fair market value of the other assets the total exceeds the total purchase price, nevertheless, the fair market value of the lemon crop should be used as its basis to petitioners. However, this interpretation is inconsistent with certain arguments made by respondent. We therefore must proceed to decide this case without a clear understanding of respondent's position. ↩
3. The only two cases cited by either party specifically referring to a reduction of the total price paid for assets by cash or its equivalent are two Memorandum Opinions of this Court. The Bessemer Limestone and Cement Company, T.C. Memo. 1956-250↩, dated November 13, 1956, and L. M. Graves, entered May 14, 1952.
4. In the instant case one of the representatives of Golden Citrus testified as follows in respect to petitioners' agreement to cultivate the lemons to maturity: THE COURT: * * * Now, if there had been some instances on the Seller's part that part of the obligation placed on the Seller, under that paragraph 8, had been taken over by you or by the Purchaser, your company there, would you have paid the same price for the lemons? THE WITNESS: No. * * *
THE COURT: Would you have paid more or less for them? THE WITNESS: Paid less. THE COURT: And how would you have figured how much less? THE WITNESS: I would expect by our estimate of the amount of the expense the Seller of the crop wanted us to take over.↩
5. The purchase price of $889,615.27 less $228,077.95 (the sum of the $224,042.65 allocated to "quick assets" and the $4,035.30 assets sold to Del Norte Lemon Company).↩