**Crumes H. DUNN and Ruth Adele Dunn, Plaintiffs,**

v.

**UNITED STATES of America, Defendant (two cases).**

**DUNN–McLEAN ENTERPRISES, INC., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Allie McLEAN, for herself, and as Devisee of R. L. McLean, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant (two cases).**

**Civ. Nos. 64–338 to 64–342.**

United States District Court
W. D. Oklahoma.
Aug. 15, 1966.

Charles C. Dunn, Tulsa, Okl., for plaintiffs.

Robert I. White, Attorney, Tax Division, Department of Justice, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

In this case the plaintiffs sue for tax refunds under the provisions of 28 United States Code, Section 1346(a) (1).

Prior to 1958, Crumes H. Dunn and R. L. McLean, as partners, obtained "Dairy Queen" franchises from the State franchise holder for several geographical areas, each franchise being exclusive for the area involved. These franchises provided that the purchasers of the franchise would indefinitely pay the seller of same 35¢ per gallon of mix used in making Dairy Queen. This amount was eventually reduced by agreement to 28¢ per gallon for eight months of each year and 17¢ per gallon for the four winter months. The case of Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, 250 F.2d 503 (Tenth Circuit, 1957), held that a grant of this franchise was the sale of a capital asset by the seller for which the seller would pay tax on a long-term capital gain basis and not as ordinary income; that it was not a mere license for income tax purposes.

In 1958 Dunn and McLean, who then owned several franchises, formed a corporation known as Dunn-McLean Enterprises, Inc., to which corporation they transferred four of their Dairy Queen franchises, and stores and equipment pertaining to each, and they also leased other Dairy Queen stores they owned to the corporation. The stock of the corporation in its entirety was issued to Dunn and McLean and their wives. The by-laws of the corporation contained a provision that 25 percent of the stock shall be held in trust by the stockholders pursuant to authority granted the Board of Directors to establish an employee incentive stock ownership plan prior to January 1, 1965.

In transferring to the corporation the tangible assets pertaining to the four franchises, the same were given a value of $45,000.00 for which the said stockholders received $45,000.00 in corporate stock. These assets, when owned by the

Dunn and McLean partnership, had in part been completely depreciated and the balance had been depreciated down to the total sum of $6,817.52. The corporation, in filing its tax returns, depreciated this equipment on an acquisition or cost value of $45,000.00.

It appears that the Dunn and McLean partnership and then the corporation charged off the 28¢ per gallon of Dairy Queen mix paid to the State franchise holder as a food cost item or business expense and had been charging it off in its entirety each year. The plaintiffs agree herein that this is not a proper manner of charging off this expenditure. But they claim that they are entitled to charge it off for tax purposes in its entirety each year as depreciation on the basis of their having purchased a capital asset under the above Tenth Circuit case which was a capital gain transaction to the seller and therefore it must be a capital gain item to them as purchasers and being such is entitled to be depreciated by them and should be depreciated annually at the rate of 100 percent of the gallonage payments made each year.

In forming the corporation and transferring certain assets to it the plaintiffs Dunn and McLean placed with the corporation some $14,000.00 in net assets in the form of cash, checks, prepaid rent and inventory which in due course of time they received back from the corporation in cash without the payment of any interest. In addition, on the four franchises transferred to the corporation and the leases granted on other stores it was provided that the sellers (the partners) would receive from the corporation the sum of 20¢ per gallon on all Dairy Queen mix which 20¢ per gallon would be paid to them by the corporation in addition to the 28¢ per gallon which the corporation assumed and agreed to pay to the State franchise holder. In due course the Dunn-McLean interests acquired the State franchise so, in effect, they are now receiving from the corporation a total sum of 48¢ per gallon on Dairy Queen mix which income they assert is taxable to them as a long-term capital gain and which payments the corporation which they own and control has been charging off 100 percent as a food cost item or business expense and which the corporation now claims should be depreciated by it each year on the basis of 100 percent of all payments so made.

The defendant in examining the tax returns involved did not agree with the above procedures and made assessments which have been collected and which this litigation seeks to recover on behalf of the plaintiffs.

The defendant first asserts that the corporation is not entitled to depreciate the tangible assets received on the basis of $45,000.00 but only on the basis of $6,817.52, for the reason that the partners who owned this equipment prior to transferring it to the corporation, own all the stock of and control the corporation with their wives and, therefore, pursuant to the provisions of 26 United States Code, Sections 351 [1] and 362, this is a non-taxable transfer. The defendant urges that the aforementioned provision in the by-laws only authorizes the Board of Directors to create a plan and place the stock in trust for employees, that no plan was ever formed, that no trust was ever created, that no stock was ever transferred, that no beneficiaries of a trust have ever been identified, that according to the stock register book all of the stock is still in the names of Dunn

1. The pertinent language of Sections 351 and 26 U.S.C. § 368(c) is:
"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation."

Section 368(c) provides as follows:
"* * * term 'control' means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

and McLean and wives and that under this provision the ownership and control of the stock is and always has been in the transferors. Therefore, the corporation is not entitled to depreciate the equipment at the figure of $45,000.00, but only at the figure of $6,817.52.

Further, it is the position of the defendant with reference to the 28¢ per gallon payable to the State franchise holder that the corporation is not entitled to deduct this payment 100 percent each year, as it has been doing, but instead under the law and cases cited the corporation must capitalize this amount each year for such benefits as may come about in the future through a sale of the business.

With reference to the 20¢ payable per gallon to the Dunn-McLean interests the defendant asserts that these payments are, in fact, disguised dividends to the stockholders inasmuch as there existed no reasonable or fair basis for setting up said payments at the time of the transfer of the assets to the corporation. In this connection, the defendant claims that in 1957, the year prior to the formation of the corporation, the four stores involved had a net profit of only approximately $25,000.00, which did not include any salaries to Dunn and McLean who worked in the operation; that immediately upon incorporation salaries were fixed for both totaling $17,000.00 per year with a 1% of gross sales bonus to Dunn; that, therefore, the four stores at the time of sale would have only shown to a prospective purchaser a net profit for 1957 in the sum of approximately $6,000.00. It is then contended, in view of this financial situation, that it would be unreasonable to expect a prospective purchaser to agree to pay not only the 28¢ per gallon to the State franchise holder

but, in addition thereto, the further sum of 20¢ per gallon to his immediate sellers. It is the assertion, therefore, of the defendant that this 20¢ per gallon payment is a means whereby the plaintiffs and particularly Dunn and McLean are attempting to place all of the Dairy Queen income except their salaries into a tax status of being subject only to the payment of a long-term capital gain tax under the above cited Tenth Circuit opinion.

We are, therefore, confronted with three problems in these consolidated cases, the first being how to treat the tangible assets transferred to the corporation with reference to their being depreciated by the corporation and, second, whether the corporation is entitled each year to deduct all of the 28¢ per gallon payments made to the State franchise holder or should the same be capitalized and, third, whether or not the 20¢ per gallon payments to Dunn and McLean are to be allowed to stand as payments for the franchises involved or if they should be treated as a disguised profit or dividend to the stockholders of the corporation.

With reference to the first issue the Court finds from the evidence that ownership of all the stock in the corporation and the control of the corporation at all times was and is completely in the transferors of the said tangible assets to the corporation and their wives. Therefore, the position of the Government is correct and depreciation to the corporation is allowable only from a starting figure of $6,817.52 and not the figure of $45,000.00 as used. This is because the wives as owners of a part of the stock under Treasury Regulations on Income Tax, 1954 Code, Section 1.351–1(b) (1), 26 C.F.R., Section 1.351–1(b) (1) [2] are

2. This Regulation reads as follows:
    "Where property is transferred to a corporation by two or more persons in exchange for stock or securities, as described in paragraph (a) of this section, it is not required that the stock and securities received by each be substantially in proportion to his interest in the property immediately prior to the trans-

fer. However, *where the stock and securities received are received in disproportion to such interest the entire transaction will be given tax effect in accordance with its true nature, and in appropriate cases the transaction may be treated as if the stock and securities had first been received in proportion and then some of such*

treated, in effect, as being their husbands for the purpose of considering the questions of ownership and control. Further, the Court finds that the test here is the ownership of the stock or control of the stock and in this case all of the stock was owned and controlled by the transferors and their wives notwithstanding the provision inserted in the by-laws which authorized the creation of a plan and a trust neither of which was ever, in fact, accomplished. The Court further finds that this provision [3] was placed in the by-laws by those concerned for the specific purpose and intent of attempting to obtain a double depreciation of the tangible assets rather than for the purpose of ever relinquishing ownership of any of the stock in trust or otherwise to employees. This finding is amply supported by the evidence when it is seen that no trust was ever formed, no employee incentive stock ownership plan was ever drawn up, no stock was ever transferred to any employee, no trust beneficiary was ever identified and the date by which it was to be accomplished, namely, January 1, 1965, has passed without any of these things being accomplished. The plaintiffs urge upon the Court the case of Woolsley v. United States, D.C., 208 F.Supp. 325, which is most easily distinguished. In the Woolsley case there was a trust actually established and the stock actually transferred to the name of the Trustee. The trust beneficiaries were known and identified. This is not the case at bar. The case, therefore, has no application here.

With reference to the second problem, the manner of how to treat (as to the corporation) the 28¢ per gallon payments to the State franchise holder, we must first recognize that the granting of a Dairy Queen franchise under which these payments are made has been established by the aforementioned case in the Tenth Circuit as being a sale of a property right deemed to be a capital asset as to the seller of the same.

These franchise grants or sales, however, carry with them no tangible assets but as the above mentioned case states, each consists of "only a single bundle of rights." All of the tangible assets involved, including the patented machines which make Dairy Queen, were transferred in return for the $45,000.00 in stock. These tangible assets are depreciable by the corporation but only on the proper basis as above held. Thus, the franchises themselves as transferred by the Dunn-McLean partners to the corporation, for which Dunn and McLean were to receive an additional 20¢ per gallon of Dairy Queen mix with the corporation to assume the 28¢ per gallon payments to the State franchise holder, were the sale and transfer of intangible assets— single bundles of rights—as distinguished from tangible assets.

A tangible asset is, of course, clearly subject to depreciation and is a proper deduction from gross income as provided by 26 U.S.Code, Section 167(a). This Section allows a deduction on the basis of a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income, including a reasonable allowance for obsolescence.

But in the problem at hand we are not dealing with tangible property but rather we are dealing with intangi-

---

stock and securities had been used to make gifts (section 2501 and following), to pay compensation (section 61 (a) (1)), or to satisfy obligations of the transferor of any kind. (Emphasis supplied.)"

3. This provision in the by-laws reads as follows:
"The Board of Directors shall be authorized to establish an incentive stock ownership plan under which key employees as are designated by the Board of Directors will be permitted to purchase shares of stock in said corporation. That said plan shall be established on or before January 1, 1965, and shall be limited to five such employees. That 25 percent of the outstanding capital stock of said corporation shall be held in trust by the stockholders for this said incentive plan."

ble properties. A Treasury Regulation,[4] which has been in force for many years and which must be considered as having been clearly and fully approved by the Congress, treats with the matter of the depreciation of intangible property. This article allows depreciation where the business use of the intangible property is limited in duration. However, intangibles, the use of which in business or trade is not so limited are not usually the proper subject for such an allowance. Even so, if an intangible asset acquired through a capital outlay is known from experience or other factors to be of use in the business for only a limited period, the length of which can be estimated from experience with reasonable certainty, then such an intangible asset may be the subject of a depreciation allowance. It follows that if intangible property is not subject to a depreciation allowance and is acquired through capital outlay the amount expended for the same must be capitalized for such benefits as are afforded by that procedure.

■ Thus, in the matter before us it is necessary to consider whether the use of the franchises involved, the "single bundles of rights," are limited in duration or are to have a use for only a limited period, the length of which can be estimated from experience or other factors with reasonable certainty. The franchises we are dealing with provide for perpetual rights to make and sell a trademark product within a designated territory. The Government claims that each franchise herein is an intangible property which cannot be the subject of a depreciation allowance because it is of indefinite duration and that this matter is governed by the Treasury Regula-

tions. See Footnote 4. With this I agree.

The Government cites many cases in support of its position. International Textbook Company v. United States, 44 F.2d 254, 71 Ct.Cl. 132, in which it is held that no portion of a down payment on a royalty contract granting rights of indefinite duration to sell courses in domestic science was deductible by depreciation as an exhaustion of capital assets. Nachman v. Commissioner of Internal Revenue, 5 Cir., 191 F.2d 934, involved the purchase of a retail liquor license which possessed a valuable renewal privilege of indefinite duration. The purchaser of the retail liquor license paid a sizeable premium for the same above the regular annual fee and attempted to depreciate the premium payment. He was not allowed to do so on the basis that the capital asset was intangible property of indefinite duration; that the taxpayer was not entitled, in computing income tax, to an amortized depreciation allowance on this intangible capital asset. In KWTX Broadcasting Company, Inc. v. Commissioner of Internal Revenue, 5 Cir., 272 F.2d 406, a three-year TV license which was purchased was not allowed to be depreciated for the reason that it was an intangible asset and since the Federal Communication Commission had never refused to grant a renewal of a license such as this once it had been granted there was no known experience or other factor establishing a limited period, the length of which can be estimated with reasonable accuracy so as to allow depreciation. The Court held this intangible property not to possess a use for only a limited period, known from experience, which would permit its cost to be depreciated.

4. The Treasury Regulations Applicable (Treasury Regulations on Income Tax, 1954 Code, Sec. 1.167(a)–3) provide as follows:

    *Intangibles.* If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject

of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to good will. * * *

In Westinghouse v. CIR, 3 Cir., 309 F.2d 279, it was held that a two-year television network contract which was automatically renewable was an intangible property not subject to depreciation. This was because the same had an indeterminate useful life.

In Gant v. CIR, 6 Cir., 263 F.2d 558, a taxpayer bought a business for which he paid one-half thereof in cash and agreed to pay the seller for the other one-half a certain amount per month so long as the seller lived or the business prevailed. The Court first held that no partnership or joint venture existed between the taxpayer and the seller; then that the monthly payments to the seller were capital investments which had to be capitalized and recovered when the business was sold and the same were not subject to be depreciated because they were payable over an entirely unascertainable future period. And in Shufflebarger v. Commissioner of Internal Revenue, 24 T.C. 980 and Associated Patentees v. Commissioner of Internal Revenue, 4 T.C. 979, we find situations where grazing preferences or leases had been sold to a taxpayer who desired to depreciate the same but depreciation was not allowed for the reason that the grazing preferences or leases were of indefinite duration and there was no ascertainable amortization period for the purpose of depreciation.

Then in Coca Cola Bottling Company v. Commissioner of Internal Revenue, in 6 B.T.A. 1333, we find that a Coca Cola franchise is not depreciable because it is of indefinite duration and is an intangible property. When the Coca Cola business involved in this case was sold the identifiable tangible assets were depreciable starting with their cost but that the amount of money paid for the franchise itself was not depreciable.

In the case at bar, the tangible assets are depreciable on the proper basis but whatever is paid for the franchise which is of indefinite duration may not be depreciated as claimed by the taxpayers herein.

The plaintiffs herein urge the Court to adopt a line of patent cases which involve franchises sold with respect to certain rights under patents. In these cases these franchises are of definite duration, namely, the life of the patent involved as fixed by law. It is therefore proper in these cases to allow depreciation but they are not controlling in the case at bar which involves franchises of indefinite duration. The great weight of authority appears to hold that intangible property with an unascertainable useful life is not subject to amortization or depreciation. This rule would clearly be applicable, if, for instance, the corporation herein paid a fixed sum at the start for the franchise. This payment would have to be capitalized and recovered when the business was ultimately sold. The fact that the parties here negotiated a different sale price, that is 28¢ per gallon forever, rather than a fixed figure, should make no difference in the legal conclusion which must be reached herein.

The Court therefore finds and concludes that Dunn-McLean Enterprises, Inc., purchased intangible property in the franchises involved, each of which had an unascertainable useful future life, and acordingly no deduction for depreciation or amortization is permitted therefor. The Court is reluctant to reach this conclusion since over-capitalization could occur but it is the necessary consequence of the holding of the Court of Appeals for the Tenth Circuit in Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, supra.[5] To hold

5. The Court of Appeals for the Ninth Circuit has treated the gallonage payments as ordinary income in Moberg v. Commissioner of Internal Revenue, 310 F.2d 782 (1962); accord, Estate of Gowdey v. Commissioner of Internal Revenue, 307 F.2d 816, 820 (C.A.4th, 1962); United States v. Wernentin, 354 F.2d 757 (C.A. 8th, 1965); see also Moberg v. Commissioner of Internal Revenue, 305 F.2d 800 (C.A.5th, 1962) (case remanded to Tax Court for determination of treatment of gallonage payments; on remand such were held ordinary income. T. C. Memo 1963–268).

otherwise would be contra to the holding of this Circuit as announced in the Dairy Queen case, supra, and would permit the parties to receive sizeable gallonage payments and pay taxes thereon on a long-term capital gain basis and then allow their operating corporation to deduct these same payments in full as a depreciation allowance.

With reference to the third issue, the question is whether the 20¢ per gallon payments to be made forever by the corporation to Dunn and McLean interests are disguised dividends to them as shareholders of the corporation or if they represent a long-term capital gain to them as fair and reasonable consideration and income for their sale of the four franchises involved to the corporation. 26 U.S.C. Sections 301 and 316. The burden of proof here rests with the plaintiffs. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). The test is whether these 20¢ per gallon payments constitute a bona fide business arrangement based on a fair and reasonable consideration for the four franchises at the time of their sale to the corporation or if such gallonage payments were in truth and in fact merely distributions of anticipated corporate earnings masquerading as something that might produce more beneficial tax consequences. Crabtree v. Commissioner of Internal Revenue, 22 T.C. 61. Whether or not in this case the corporation is distributing a dividend or something else is a question of fact to be determined by the Court and no one factor is determinative. The trier of this fact must consider and weigh all facts involved before reaching its decision. Goldstein v. CIR, 298 F.2d 562 (Ninth Cir. 1962).

From the evidence the Court finds that by paying reasonable salaries to the managers of the operations involving the four franchises over the five-year period prior to the sale to the corporation, a total loss would be shown for the five-year period of $13,717.37 or an average loss per year of $2,743.47. The 20¢ per gallon payments to Dunn and McLean by the corporation amounted to nearly $6,000.00 per year as shown for each of the two years following the sale. Gallonage involved per annum was well known from experience for past years and a highly accurate estimate could have been made at the time of the sale in 1958 as to what would be paid per year by a purchaser under the 20¢ per gallon obligation. Paying this amount forever would amount to quite a price to pay for franchises which had lost an average of $2,743.47 for the past five years.

The evidence of the plaintiffs to meet their burden of proof consists mainly of the fact that Dairy Queen stores in other states were known to be paying gallonage in the neighborhood of 48¢ per gallon. This evidence and this type of evidence is not sufficient to meet the burden of the plaintiffs.

Under all the evidence and circumstances the Court finds that the plaintiffs have not met their burden of proof. The Court finds from the evidence that the 20¢ per gallon arrangement was not a bona fide business arrangement but rather a means to distribute corporate earnings in such a manner as to produce more beneficial tax consequences by fixing tax liability on a long-term capital gain basis to the shareholders rather than be subject to ordinary income tax as a dividend or profit by the corporation.

The arrangement effected would be perfectly proper if the sale of the franchises in this manner was based on a fair and reasonable foundation and consideration under all the facts and circumstances but the Court finds that no reasonable prospective purchaser would make such a deal in the circumstances as they existed. The only person who would make such a non-business like purchase would be the seller himself and the whole thing accomplished not as a bona fide transaction but as one wholly lacking in reasonableness and fairness and set up for tax consequences. In fact, this whole arrangement was carefully created so that as much of the corporate profits as possible would be placed under the effect of the Dairy

Queen case ruling by the Tenth Circuit, that is to say, to place as much of the corporate earnings as possible into franchise payments so as to receive the same for tax purposes on a long-term capital gain basis and not receive the same for tax purposes as ordinary income. The franchises simply did not have this value in truth and in fact, and no reasonable person would ever pay or make this arrangement to pay for the same. The 20¢ per gallon payments cannot be found to have been a fair and reasonable consideration for the transfer of the franchises but were highly excessive and amounted to a means of distributing profits in a manner to create a lighter tax burden.

Accordingly, the Court finds and concludes that such 20¢ per gallon payments were anticipatory distribution by the corporation of earnings and profits and such payments should be treated as dividends to the recipients and non-deductible dividend distributions by the corporation.

Counsel for the defendant will prepare an appropriate judgment or judgments based on the foregoing and submit the same to the Court for signature and entry.