**E. T. GRISWOLD et al., Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 24248.

United States Court of Appeals
Fifth Circuit.

Sept. 3, 1968.

Roger L. Davis, Fort Lauderdale, Fla., for appellants.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Harold C. Wilkenfield, Solomon L. Warhaftig, Richard C. Pugh, Robert H. Solomon, Attys., Dept. of Justice, Lester R. Uretz, Chief Counsel, Aaron D. Trub, Atty., IRS, Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

This appeal involves income tax deficiencies assessed against Independent Cigarette Service of Dade, Inc., a corporate taxpayer, and E. T. Griswold and J. F. Fielden, as individuals. The Tax Court, 45 T.C. 463, held the petitioners liable for the deficiencies.

There are three issues here: (1) whether, as a result of multiple corporate transactions, the taxpayers were entitled to a stepped up basis in the new corporation, thereby enabling them to amortize certain vending machine locations acquired as the result of a purchase of stock and the subsequent liquidation of the purchased corporation, (2) whether the locations were subject to depreciation, and (3) whether payments made by the corporation were personal income to these individual stockholders.

We affirm the decision of the Tax Court.

Griswold and Fielden were the major shareholders in two corporations, Miami Cigarette Machine Company of Dade and Miami Cigarette Company of Broward. These corporations controlled approximately 1,000 cigarette vending machines. On April 4, 1960, Griswold and Fielden purchased all the outstanding capital stock of Independent Cigarette Service, Inc. (hereafter Independent No. 1) for

$234,500. Pursuant to the purchase agreement, Griswold and Fielden paid the sellers $70,000 in cash and executed and delivered six promissory notes, totaling $164,500, for the balance of the purchase price. In return, they received the capital stock of Independent No. 1. Two of the notes were payable in two years and the other four were due in six years. The notes were placed in a bank for collection and the capital stock of Independent No. 1 was deposited along with the notes as collateral. In other words, the product of the sale was pledged as security for the payment of its purchase price, with Griswold and Fielden each owning thirty-five of the outstanding shares so acquired and thus hypothecated.

Prior to the execution of the agreement of sale and purchase, the individual taxpayers consulted a certified public accountant concerning the best method of acquiring Independent No. 1 as to tax advantages. They were advised that if it was not possible to purchase the assets of the corporation, the best method would be to acquire its capital stock and liquidate that stock immediately thereafter. Unfortunately for them, Griswold and Fielden did not comply with this advice in that the agreement of purchase and sale contained a clause to the effect that the corporate existence of Independent No. 1 would be maintained at all times in good standing, subject only to the proviso that the authorized capital stock might be increased under certain, specified conditions. Such an increase was, in fact, accomplished. The charter of Independent No. 1 was amended. Its seventy shares of capital stock (sold to Griswold and Fielden but deposited with the bank as collateral to secure the payment of the purchase money promissory notes) were increased to 3,500 shares. These shares were distributed equally between the two but were substituted as collateral for the notes. On April 30, 1960, subsequent to the sale of April 4, the name of the corporation was changed to Independent Cigarette Service of Dade County, Inc. (hereinafter

Independent No. 2). There had been no action taken to liquidate Independent No. 1.

It was not until December 27, 1960, that a plan for liquidating Independent No. 2 was adopted by the taxpayers. On January 23, 1961, the assets of Independent No. 2 were transferred to Griswold and Fielden in exchange for their stock, and the liquidation took place. At that date; Independent Cigarette Service of Dade, Inc. was created (Independent No. 3). The assets of Independent No. 2 were then transferred to Independent No. 3, which had authorized capital stock of 5,000 shares of common stock ($1.00 par value), of which 3,500 shares were issued. At the same time Independent No. 3 issued unsecured six per cent (6%) demand notes, in the amount of $85,000 to Griswold and Fielden. These notes, together with the *newly issued stock*, were substituted for the stock of Independent No. 2 as collateral with the bank to secure the original obligation of Griswold and Fielden to pay for the stock they had originally acquired in Independent No. 1.

During the tax years in question, Independent No. 3 undertook to amortize the "prepaid location costs" attributable to the locations owned by Independent No. 2 at the time its entire capital stock was purchased by Griswold and Fielden. After Independent No. 3 was set up, Griswold and Fielden made no payments of principal or interest to the bank on the obligations incurred in the original purchase of the capital stock of Independent No. 1. The corporation, Independent No. 3, made the payments directly to the bank debiting notes and interest payable, Griswold and Fielden, and crediting cash.

The Tax Court disallowed the amortization of the vending machine location costs because these costs had acquired a zero basis and held that the payments made by Independent No. 3 to the bank were income to Griswold and Fielden.

I

The petitioners stand on the proposition that the amortization issue calls for the application of the rule laid down in Kimbell-Diamond Milling Company v. Commissioner of Internal Revenue, 14 T.C. 74, affirmed by the Fifth Circuit 187 F.2d 718 (1951), cert. den. 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626. Succinctly stated, the *Kimbell-Diamond* rule is that where the stock of a corporation is purchased for the purpose of liquidating it and obtaining its assets, the transaction for tax purposes will be regarded merely as a purchase of the assets. The taxpayers say that the purchase of the stock of Independent No. 1 was only the first step in their plan to liquidate the corporation and that a proportionate amount of the purchase price should be allocated to the cigarette machine location costs so as to permit their amortization. The Tax Court rejected this theory because the purchase agreement itself expressly provided that Independent No. 1 was to retain its corporate identity. In other words, the purchase agreement *prohibited* the very liquidation that taxpayers now seek to invoke. The taxpayers seek to avoid this fatal snag by saying that they told their lawyer when he was drafting the purchase agreement that they wished to accomplish liquidation. Again to their misfortune, the taxpayers themselves never read the agreement and when confronted with it acknowledged that it seemed to prohibit liquidation.

So, we now meet the argument that this Court should recognize the "intent" of the taxpayers and the "manifest injustice" of the Tax Court decision. The Government argues that the petitioners are bound by the express terms of their own contract, regardless of intent.

The Government contends that the *Kimbell-Diamond* rule is inapplicable, in that there was no integrated, multiple-step purchase of assets, but merely a purchase of stock and a later, unrelated liquidation of the corporation. The Government further contends that the actual result of the taxpayer's dealing was a § 368(a) (1) (D) or § 368(a) (1) (F) reorganization, I.R.C. § 368(a) (1) (D) and (F) (1954).

In arguing that the *Kimbell-Diamond* rule is applicable, the taxpayers maintain that their purchase of the stock of Independent No. 1 was only the first step in a pre-arranged plan to liquidate the corporation.

## A.

The courts have been less than clear in determining whether the intent of taxpayers at the time of purchase of stock was to purchase the assets. One court maintained that "whether for tax purposes several acts constitute separate and distinct transactions or are integrated steps in a single transaction is a question of fact", and thus not reviewable. Jacobs v. Commissioner of Internal Revenue, 9 Cir., 1955, 224 F.2d 412. Agreeing generally with that approach, the Ninth Circuit later stated in United States v. Mattison, 273 F.2d 13, 83 A.L.R.2d 706 (1959), that when the application of a legal principle, and not simply facts, was involved, the appellate court must review. It continued:

"The *Kimbell-Diamond* rule is not to be applied unless the purpose of the transaction was to acquire the assets of the company whose stock has been purchased. Evidence of such contemporaneous purpose is found where the acquired assets are immediately integrated into the business operations of the purchaser. But to conclude from this that integration must be shown to give application to the rule is to confuse the rule with one method of establishing its applicability.

"In our opinion, any circumstance which shows that the contemporaneous purpose of the transaction was to acquire the assets calls for application of the rule. * * *"

Id. at 19. (Taxpayer bought stock of corporation. Three days later he wound up business and had assets transferred to him. Effect of application of *Kimbell-Diamond* was to place capital gains in earlier accounting period).

In a similar situation, a corporation desired to buy out the assets of a competitor. Since the competitor was unwilling to sell its assets, the majority stockholders in the purchasing corporation bought all of the stock of the competitor. About five months later, after the last payment had been made on the stock, the competitor was liquidated and its property assigned to the corporation which had originally sought them. The Sixth Circuit, in determining whether the transaction was in "intent, purpose and result" a purchase of assets, stated:

"It is not decisive that the purpose of Swiss [the purchasing corporation] to acquire the Union [acquired corporation] properties is not recited in formal agreements executed to bring about that result if that purpose is disclosed by circumstances which beyond controversy proclaim it. * * *"

Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 99 F.2d 588 (1938). The Court was not persuaded that the stockholders holding the stock almost a year destroyed its transitory character, *since the contract would not permit the new corporation to buy the stock or liquidate the corporation until necessary payments had been made.* Plans to secure the assets were clearly disclosed at trial by witnesses and exhibits.

This "asset-purchase" rule has been followed by the Tax Court where the seller refused to sell the assets. In one case, due to the seller's refusal, the taxpayer purchased the stock of the corporation, liquidated it and transferred the assets to a new corporation less than a month after the purchase of stock. The Court held that the assets of the corporation were in fact purchased by the new corporation. James F. Suter Estate, 29 T.C. 244. Significantly, the stock purchase agreement had a supplemental agreement providing that the purchasers could liquidate the corporation and transfer the assets to a new corporation.

The petitioners here rely on Foran v. Commissioner of Internal Revenue, 5 Cir., 1948, 165 F.2d 705, to point out that where there is direct and positive

evidence from a witness who is the most closely related to the question in issue, and since this testimony is consistent with all the facts the Court may not refuse to follow that testimony. However, in *Foran* the witness' testimony was the only evidence before the Court. Furthermore, the Court noted that "intent may be proved by circumstances" and that "a party's testimony as to his intent may be rebutted by proof of circumstances which are inconsistent" with that testimony. Id. 707.

This Circuit has stated that, in tax cases, one cannot make the generalization, as petitioners have, that substance controls the form of the transaction, "since in numerous situations the form by which a transaction is effected does influence or control its tax consequences". United States v. General Geophysical Co., 5 Cir., 1966, 296 F.2d 86.

While we agree with *Mattison* and *Ashland Oil* insofar as they state that evidence of a single, integrated transaction may be shown from circumstances other than the formal agreements, we do not think the contents of the agreements are to be ignored. Nor do we think that *any* and *every* circumstance which shows a contemporaneous purpose to acquire the assets of the corporation requires the application of the *Kimbell-Diamond* rule.

In the present case, the sellers of Independent No. 1 refused to sell the assets of that corporation. Despite advice from the taxpayer's accountant that if they could not purchase the assets of Independent No. 1, they should purchase the stock and liquidate the corporation immediately, they entered into the purchase agreement by which they specifically and unambiguously covenanted that the existence of the corporation would be kept intact. After the purchase of Independent No. 1 by Griswold and Fielden, the business of the corporation continued without change for nearly eight months.

We accept the finding of the Tax Court that the taxpayers did not engage in or consummate a single, integrated transaction to acquire the assets of Independent No. 1, Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

**B.**

We examine now the Tax Court's conclusion that the transaction whereby the assets of Independent No. 2 were transferred to Independent No. 3 was no more than a non-taxable reorganization. The Government forcefully argues that a "D" or "F" reorganization actually took place.

A "D" reorganization is:

"A transfer by a corporation of all or part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under sec. 354, 355, or 356".

I.R.C., § 368(a) (1) (D).

An "F" reorganization is "a mere change in identity, form, or place of organization, however effected." I.R.C., § 368(a) (1) (F).

If, in fact, either a "D" or "F" reorganization has occurred, the basis of Independent No. 2 is the same as it would be in the hands of the transferor corporation, or apparently zero. I.R.C., § 362(b).

This Court earlier dealt with a situation somewhat analogous to the present case. In Reef Corp. v. Commissioner of Internal Revenue, 5 Cir., 1966, 368 F.2d 125, two groups of stockholders owned a corporation (No. 1). One group, A, decided to buy out the other group, B.

To do this, A formed a second corporation, No. 2. A received No. 2's stock in exchange for some of its No. 1 stock. No. 1 agreed to sell its assets to No. 2. All of the stock in No. 1 was then sold to a third party who was to sell the assets to No. 2. This was done by delivering No. 1 stock to the third party in return for his notes. Later, he would be reimbursed by No. 2.

The business of No. 1 continued without interruption. In its first tax return, No. 2 depreciated assets on basis of cost of the assets to it, a stepped up basis. This method was rejected by the Tax Court, and that was affirmed on appeal. This Court agreed that a "D" reorganization had taken place, and as a result, a carry-over of the basis of corporation assets was required. Id. at 130–131.

More recently, it was held that a person, majority stockholder in a state bank, carried out a "D" reorganization when he secured a national bank charter, incorporated that bank with the same assets and stockholders of the state bank, transferred the state bank's assets to it, dissolved the state bank, and carried on business as before. Babcock v. Phillips, 10 Cir., 1967, 372 F.2d 240.

In Davant v. Commissioner of Internal Revenue, 5 Cir., 1966, 366 F.2d 874, cert. den. 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460, reh. den. 389 U.S. 893, 88 S.Ct. 14, 19 L.Ed.2d 203, it was pointed out that taxpayers

"cannot liquidate a corporation with the intention of immediately reincorporating it in order to hold back liquid assets and cash for the purpose of getting capital gains treatment or to obtain a stepped-up basis * * *. Such a liquidation reincorporation does not qualify for section 331".

Id. at 882.

The Court noted that, when the reorganization provisions of the tax law were adopted, one evil sought to be avoided was the disguising of a reorganization as a sale to obtain more favorable tax benefits. One way to accomplish this, the Court said, was for the old corporation to transfer its assets to the new corporation in exchange for stock, which is then distributed to the old corporation's stockholders. Another method was for the stockholders to form a new corporation to which the old sells its property, and the old corporation is liquidated. A third method was to liquidate the old corporation and transfer the assets to the new corporation. Id. at 885, footnote 24.

■ The reasoning of *Reef* and *Davant* is persuasive and is applicable to the transaction in dispute. We agree with the Tax Court that the taxpayers actually engaged in a corporate reorganization when Independent No. 2 was liquidated and its assets transferred to Independent No. 3 in exchange for stock in No. 3. Consequently, the taxpayers must take the basis of the transferor corporation, Independent No. 2. This was a "D" reorganization for the following reasons: (1) there was a transfer by Independent No. 2 of all of its assets to Independent No. 3; (2) immediately after the transfer, the stockholders of the transferor, Griswold and Fielden, were in control of the corporation to which the assets were transferred; (3) pursuant to this reorganization, the stock of Independent No. 3 was distributed in a § 354 transfer. Thus the requisites of § 368(a) (1) (D) have been satisfied.

We also conclude that the petitioners' activities come within the definition of an "F" reorganization, since they consisted of no more than a mere change in identity and form of Independent No. 2. I.R.C., § 368(a) (1 )(F).

C.

Even if *Kimbell-Diamond* is applicable, we are not satisfied that the cigarette vending machine locations, the intangible assets sought to be amortized by the taxpayers, are assets properly subject to amortization.

Under the present law, a reasonable amortization deduction is allowed for the exhaustion, wear and tear of property used in the taxpayer's business, or of property held for the production of income, I.R.C. § 167(a) (1954). The property, to be depreciable, must be an inherently wasting asset, but this allowance is not limited to tangible assets.

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible [asset] has a limited useful life * * *."

Treas.Reg. § 1.167(a)-3. It is clear that intangible assets, to be depreciable, must be shown to be limited in duration. Premiums paid on the purchase of loan contracts were properly allowed where the contracts were individually valued, had a determinable life, and required fixed payments. Seaboard Finance Co., T.C.Memo. 1904-253. Similarly, right-of-way easements for transmission pipelines were depreciable when they were acquired under grants which would expire when the company ceased to maintain the lines. Northern Natural Gas Co. v. O'Malley, 8 Cir., 1960, 277 F.2d 128. On the other hand, depreciation has been held not allowable on trademarks, Sammons v. Commissioner of Internal Revenue, 7 Cir., 1949, 177 F.2d 837; trade names, Clark Thread Co. v. Commissioner of Internal Revenue, 3 Cir., 1939, 100 F.2d 257; and contracts of undefined duration, Curry v. United States, 4 Cir., 1962, 298 F.2d 273 (electric power contract).

Following Treas.Reg. § 1.167(a)-3, one District Court recently held that "Dairy Queen" franchises purchased from another corporation could not be depreciated, Dunn v. United States, W.D.

Okla., 1966, 259 F.Supp. 828. An attempt to depreciate the cost of a television license was rejected because the FCC rarely refused to grant a renewal, making the asset one of unknown duration, KWTX Broadcasting Company, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1959, 272 F.2d 406. Similarly, grazing preferences sold to the taxpayer were not depreciable since there was no definite amortization period, Shufflebarger v. Commissioner of Internal Revenue, 24 T.C. 980.

In a widely quoted opinion, the Fifth Circuit held that a taxpayer who purchased a liquor license which possessed, by custom, a valuable renewal privilege of undefined duration, could not amortize the cost of the license, Nachman v. Commissioner of Internal Revenue, 5 Cir., 1951, 191 F.2d 934. The Court emphasized that the "basis for depreciation of an intangible capital asset is partial exhaustion due to lapse of time". Id. at 936. Since there was no rational basis for predicting its duration, the license could not be depreciated.

The Second Circuit, in Thrifti Check Service Corp. v. Commissioner of Internal Revenue, 287 F.2d 1 (1961), held that a taxpayer, in purchasing a going business, could not depreciate the amount paid for customer contracts held by its predecessor. These contracts were a single, indivisible asset with an indefinite life rather than separate contracts for limited periods. Finally, the Tax Court has held that the purchase of cigarette vending machine locations constituted the purchase of a mass asset, Scalish v. Commissioner of Internal Revenue, P-H Memo. T.C., par. 62.04b (1962). Since the location leases could be extended indefinitely, the leases had no determinable useful life and were not subject to an amortization deduction.

Although the vending machine location contracts here could be terminated and were in fact terminated in some instances, there is no way to accurately determine the useful life of these locations.

The petitioners have offered no evidence to accurately establish the duration of the assets. Many of the contracts were oral, indicating that they were of indefinite duration. In addition, even those locations covered by written contracts were generally renewed, giving them an undetermined useful life. *KWTX Broadcasting Co.,* supra.

While the Tax Court considered it unnecessary to reach or decide the Government's alternative contention that the locations in question had an indeterminate useful life and were thus not subject in any event to amortization, on this record we agree with the Government in this regard.

## II

■ We now must decide whether the payment by Independent No. 3 of principal and interest to satisfy the stockholders' obligation on their notes was in retirement of debt of Independent No. 2 to its stockholders and thus deductible, or was a disguised dividend, and taxable.

Taxpayers Griswold and Fielden contend that, when Independent No. 3 was formed, the corporation issued to them stock and notes in the sum of $85,000 payable on demand. To retire these debts to the stockholders, they assert, the corporation made periodic payments to a bank to pay the stockholders' debts owing to the sellers of Independent No. 1. Thus, the notes to the stockholders represented a bona fide debt of the corporation.

The Government maintains, and the Tax Court held, that these payments were merely corporate distributions in behalf of the stockholders and taxable as dividends.

This Circuit has apparently had no opportunity to rule on this type of transaction. The Fourth and Ninth Circuits have split in deciding similar issues.

In Jewell v. United States, S.D.Idaho, 1963, 217 F.Supp. 572, a taxpayer bought stock in an oil company and gave a promissory note to a trust. A few weeks later, the corporation was liquidated. A partnership was formed and the corporate assets were transferred to it. A second corporation was then formed from the partnership. This new corporation executed notes to the trust, and the taxpayer's notes were cancelled. The taxpayer maintained that consideration for this was provided by his transfer of the assets of the partnership to the corporation. The Commissioner, considering it a constructive dividend, assessed a tax on the amount paid to the trust. The District Court agreed with the Commissioner:

> "The transfer of a percentage of interest in the business for the same percentage in another form cannot be regarded as consideration for the payment of a stockholder's personal debt. In substance the taxpayer, if successful, would be getting his debt paid by the corporation without parting with anything by way of property or money".

Id. at 575.

However, the District Court was reversed. Jewell v. United States, 9 Cir., 1964, 330 F.2d 761. The Ninth Circuit felt that the fact that the stockholder's note to the trust had been cancelled was crucial. As a result of the cancellation, the Court said, a genuine novation had occurred, and the corporation was merely paying its own debt, *Jewell,* at 764.

In contrast, Wall v. United States, 4 Cir., 1947, 164 F.2d 462, held that the payment of a stockholder's debt by a corporation, in return for the stockholder's transfer of his equity in his stock to the corporation, was a dividend taxable to the stockholder.

> "The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so, if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax

purposes as if the corporation pays a dividend to the stockholder, and the stockholder then utilizes it to pay his debt".

*Wall*, at 464. There was no valid consideration given for the corporation's act as long as the proportionate share of the stockholder's interest in the corporation remained the same before and after the transfer of his equity in the stock to the corporation.

Agreeing with the *Wall* approach, it has been pointed out that the fact that no formal declaration of dividend has been made is not conclusive to establish that no dividend was actually distributed. In addition:

"Corporate payments to third parties at the direction of the shareholders, or in discharge of their personal debts and liabilities, have been ruled to be in the nature of constructive dividends, constructively received by shareholders. [Citations omitted]".

Sachs v. Commissioner of Internal Revenue, 8 Cir., 1960, 277 F.2d 879 (Corporation paid stockholder's fine).

We are of the opinion that the result reached by the lower court in *Jewell* and by the Fourth Circuit in *Wall* is the better reasoned approach. The present case indicates even more clearly that Independent No. 3 was paying the personal debts of the stockholders. There is no evidence that their personal liabilities had been cancelled. The taxpayer's accountant testified that the notes were issued merely to allow the stockholders to withdraw funds to pay off their own obligation. There is less basis here than in *Wall* to find that the stockholders gave consideration for the assumption of their obligations by Independent No. 3.

This maneuver by the taxpayers was in reality the disguised payment of a dividend to Griswold and Fielden and thus taxable.

Affirmed.